IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ERIC CALL, et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>WOODROW JONES III, et al.,<br><br>    Defendants. | Civil Action No. 1:20-cv-3304-DKC |

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS AND DISMISSAL

DANIEL T. GRANT (BAR NO. 19659)
NANDINI SINGH
ALLISON M. WHELAN
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
dgrant@cov.com

SIMON J. FRANKEL
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111
(415) 591-6000

CLIFFORD D. MPARE, JR.
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
(424) 332-4800

J. ADAM SKAGGS
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
223 West 38th St. # 90
New York, NY 10018
(917) 680-3473

HANNAH SHEARER
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush St. # 555
San Francisco, CA 94104
(415) 433-2062

December 14, 2020

Attorneys for *Amicus Curiae* Giffords Law Center to Prevent Gun Violence

## TABLE OF CONTENTS

INTEREST OF THE *AMICUS CURIAE* ............................................................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................................................. 2

ARGUMENT ........................................................................................................................... 4

I.  Compelling New Empirical Evidence Confirms the Constitutionality of the Good Reason Requirement Under Intermediate Scrutiny. ............................................................ 4

    A.  Maryland has Substantial State Interests in Regulating Concealed Handguns. ............................................................................................................... 4

    B.  New Evidence Bolsters *Woollard*'s Holding that Maryland's Regulations Are Reasonably Adapted to Substantial State Interests. ......................................... 5

        1.  Permissive Concealed Carry Laws Are Associated with Higher Levels of Violent Crime. ............................................................................. 5

        2.  Firearms Are Rarely Used in Self-Defense and Do Not Increase Safety. .................................................................................................................. 8

II. Plaintiffs' First Amendment Analogy Cannot Sustain Their Complaint. ......................... 11

CONCLUSION ....................................................................................................................... 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Berron v. Ill. Concealed Carry Licensing Review Bd.*,
    825 F.3d 843 (7th Cir. 2016) ...............................................................................................11

*Bonidy v. U.S. Postal Serv.*,
    790 F.3d 1121 (10th Cir. 2015) ............................................................................................11

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ........................................................................................................1, 11

*Drake v. Filko*,
    724 F.3d 426 (3d Cir. 2013) ...................................................................................................3

*Hightower v. City of Boston*,
    693 F.3d 61 (1st Cir. 2012) .....................................................................................................3

*June Medical Services v. Russo*,
    140 S.Ct. 2103, 2134 (2020) ...................................................................................................3

*Kachalsky v. Cty. of Westchester*,
    701 F.3d 81 (2d Cir. 2012) ......................................................................................................3

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ...................................................................................................1

*Malpasso v. Pallozzi*,
    767 F. App'x 525, 525 (4th Cir. 2019) ................................................................................2, 3

*McCleskey v. Kemp*,
    753 F.2d 877, 888 (11th Cir. 1985) .........................................................................................4

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ............................................................................................................1, 5

*Peruta v. Cnty. of San Diego*,
    824 F.3d 919 (9th Cir. 2016) (en banc) ..................................................................................3

*Peterson v. Martinez*,
    707 F.3d 1197 (10th Cir. 2013) ...............................................................................................3

*Ramos v. Louisiana*,
    140 S.Ct. 1390 (2020) .............................................................................................................3

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) ..................................................................................................12

*United States v. Chester*,
    628 F.3d 673 (4th Cir. 2010) ....................................................................................................3

*United States v. Masciandaro*,
    638 F.3d 458 (4th Cir. 2011) ............................................................................................3, 4, 5

*Woollard v. Gallagher*,
    712 F.3d 865 (4th Cir. 2013) ............................................................................................ *passim*

*Woollard v. Sheridan*,
    863 F. Supp. 2d 462 (D. Md. 2012) ..........................................................................................*1*

*Wrenn v. District of Columbia*,
    864 F.3d 650 (D.C. Cir. 2017) ..................................................................................................3

**Other Authorities**

Associated Press, *Federal Agent in Road Rage Pulls Gun on Civilian in Maryland,* Wash. Times (Apr. 11, 2018),
    https://www.washingtontimes.com/news/2018/apr/11/federal-agent-in-road-rage-pulls-gun-on-civilian-i/ ..............................................................................................10

Charles C. Branas et al., *Link Between Gun Possession and Gun Assault*, 99 Am. J. Pub. Health 2034, 2037 (Nov. 2009),
    https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2008.143099....................................9

Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS) *Fatal Injury Reports*,
    https://www.cdc.gov/injury/wisqars/fatal.html..........................................................................2

Cassandra Crifasi et al., *Association Between Firearm Laws and Homicide in Urban Counties,* 95 J. Urb. Health 773, 773–74 (2018) ............................................................7

John Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*,
    16 J. Empirical Legal Stud. 198, 200 (2019) ..............................................................5, 6, 12

Kimberly Eiten, *Alarming, Rising Trend: Weapons Used During Road Rage Incidents*, CBS Baltimore (Apr. 10, 2017), http://baltimore.cbslocal.com /2017/04/10/alarming-rising-trend-weapons-used-during-road-rage-incidents/......................10

Fox4News.com Staff, *Police: Man Arrested for Shooting Uber Driver Thought He Was Helping*, Fox 4 News (May 16, 2017), http://www.fox4news.com /news/man-spots-gun-inadvertently-shoots-uber-driver...........................................................10

Rashna Ginwalla et al., *Repeal of the Concealed Weapons Law and Its Impact on Gun-Related Injuries and Deaths*, 76 J. Trauma Acute Care Surg. 569, 569, 573 (2014) ...........................................................................................................8

Mark Gius, *Using the Synthetic Control Method to Determine the Effects of Concealed Carry Laws on State-Level Murder Rates*, 57 Int'l Rev. L. & Econ. 1, 6 (2019)............................................................................................................7

David Hemenway et al., *Whose Guns are Stolen? The Epidemiology of Gun Theft Victims, 4 Injury Epidemiology* 1, 3 (2017) ...............................................................8

David Hemenway & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007–2011*, 79 Preventive Med. 22, 23 (2015). ...................................................................................8

Kevin Rector, *These Baltimore Students Aren't Afraid of Mass Shootings. They're Facing Gun Violence In Their Everyday Lives.*, The Baltimore Sun (Mar. 1, 2018), http://www.baltimoresun.com/news/maryland/baltimore-city/bs-md-excel-students-on-guns-20180219-story.html ..........................................................2

William Saletan, *Friendly Firearms: How an Armed Hero Nearly Shot the Wrong Man*, Slate (Jan. 11, 2011), http://www.slate.com/articles/health_and_science/human_nature/2011/01/friendly_firearms.html...................................................10

Michael Siegel, et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 Am. J. Pub. Health 1923, 1924-28 (Dec. 2017), https://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2017.304057...............................5, 7

U.S. Congress Joint Econ. Comm. Democratic Staff, Joint Econ. Comm., *A State-by-State Examination of the Economic Costs of Gun Violence* at 26 (2018), https://www.jec.senate.gov/public/_cache/files/b2ee3158-aff4-4563-8c3b-0183ba4a8135/economic-costs-of-gun-violence.pdf ................................................2

Violence Policy Ctr., *Firearm Justifiable Homicides and Non-Fatal Self-Defense Gun Use* (July 2019), https://vpc.org/studies/justifiable19.pdf .................................9

Daniel W. Webster et al., *Firearms on College Campuses: Research Evidence and Policy Implications,* Johns Hopkins Bloomberg School of Public Health, 8 (Oct. 15, 2016), https://nccpsafety.org/assets/files/library/Firearms_on_College_Campuses.pdf.................................................................9

Paul Zimmerman, *The Deterrence of Crime through Private Security Efforts: Theory and Evidence*, 37 Int'l. Rev. L. & Econ. 66, 66–75 (2014)...........................................8

## CORPORATE DISCLOSURE STATEMENT

Giffords Law Center to Prevent Gun Violence states that it has no parent corporations. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

## INTEREST OF THE *AMICUS CURIAE*

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to reduce gun violence and save lives. The organization was founded in 1993 after a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in October 2017 after joining forces with the gun-safety organization founded by former Congresswoman Gabrielle Giffords. Today, Giffords Law Center provides free assistance and expertise to lawmakers, advocates, legal professionals, law enforcement officials, and citizens who seek to make their communities safer from gun violence. Its attorneys track and analyze firearm legislation, evaluate gun violence prevention research and policy proposals, and participate in Second Amendment litigation nationwide. Giffords Law Center has provided informed analysis as an *amicus* in numerous important firearm-related cases, including *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *Woollard v. Sheridan*, 863 F. Supp. 2d 462 (D. Md. 2012), *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013), and *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc).

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

With this lawsuit, Plaintiffs attempt to revive a challenge to Maryland's settled authority to address devastating firearm violence within its borders through the enforcement of meaningful licensing standards for the carrying of loaded, concealed handguns in public.  Firearms cause hundreds of deaths and injuries in Maryland every year, and the ripple effect of each gunshot leaves many more people grieving and in fear for their safety.[1]  In recent years, Maryland experienced an annual average of 402 gun homicides and 262 gun suicides per year—equivalent to one gun death roughly every 13 hours.[2]  These frequent shooting deaths not only harm communities and leave survivors traumatized, they also impose enormous economic consequences, costing Maryland taxpayers an estimated $3.6 billion per year.[3]

Nevertheless, without even acknowledging the massive toll of gun violence, Plaintiffs recycle precisely the same Second Amendment challenge to Maryland's "good and substantial reason" requirement for obtaining concealed handgun permits that the Fourth Circuit rejected seven years ago in *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013), *cert. denied*, 2013 U.S. LEXIS 7384 (Oct. 15, 2013); and again just last year in *Malpasso v. Pallozzi*, 767 F. App'x 525, 525 (4th Cir. 2019) (unpublished), *cert. denied*, 2020 U.S. LEXIS 3162 (June 15, 2020).  As in

---

[1] *E.g.*, Kevin Rector, *These Baltimore Students Aren't Afraid of Mass Shootings. They're Facing Gun Violence In Their Everyday Lives.*, The Baltimore Sun (Mar. 1, 2018), http://www.baltimoresun.com/news/maryland/baltimore-city/bs-md-excel-students-on-guns-20180219-story.html.

[2] Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS) *Fatal Injury Reports*, https://www.cdc.gov/injury /wisqars/fatal.html.

[3] U.S. Congress Joint Econ. Comm. Democratic Staff, Joint Econ. Comm., *A State-by-State Examination of the Economic Costs of Gun Violence* at 26 (2018), https://www.jec.senate.gov/ public/_cache/files/b2ee3158-aff4-4563-8c3b-0183ba4a8135/economic-costs-of-gun-violence.pdf.

*Malpasso*, Plaintiffs again argue that *Woollard* should be overruled because a divided panel of the D.C. Circuit reached a different conclusion in *Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017). *Wrenn* is irreconcilable not only with *Woollard*, but also with persuasive decisions from the First, Second, Third, Ninth, and Tenth Circuits.[4] *See Peruta v. Cnty. of San Diego*, 824 F.3d 919 (9th Cir. 2016) (en banc); *Drake v. Filko*, 724 F.3d 426, 429 (3d Cir. 2013); *Peterson v. Martinez*, 707 F.3d 1197, 1211 (10th Cir. 2013); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012); *Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012). As the State's motion correctly explains and principles of *stare decisis* compel, the Complaint must be dismissed under binding Fourth Circuit precedent.[5]

Dismissal of the Complaint is plainly justified by *Woollard* alone. But dismissal is additionally appropriate on the basis of significant new empirical evidence that has emerged since that 2013 decision. The Fourth Circuit's ruling upholding Maryland's concealed carry permitting law under intermediate scrutiny was based on a body of then-current social science evidence. *Woollard*, 712 F.3d at 879–80. But newer research—discussed in this brief—confirms that Maryland's law regulating the public carry of firearms easily could survive any level of constitutional scrutiny, and certainly survives intermediate scrutiny. Indeed, the social

---

[4] Even before *Woollard*, the Fourth Circuit had rejected each analytical step the D.C. Circuit's two-judge majority employed in *Wrenn*, including *Wrenn*'s conclusion that carrying guns in public is "on par" with home possession, *Wrenn*, 864 F.3d at 664, and its error in failing to apply a form of means-end scrutiny. *See United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) (stating that the "longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable"); *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010) (ruling that under *Heller*, courts must "select between strict scrutiny and intermediate scrutiny").

[5] While adherence to precedent is not an "inexorable command" *Ramos v. Louisiana*, 140 S.Ct. 1390 (2020) (slip op., at 20) (internal quotation marks omitted), "for precedent to mean anything, the doctrine must give way only to a rationale that goes beyond whether the case was decided correctly," *See June Medical Services v. Russo*, 140 S.Ct. 2103, 2134 (2020).

3

science studies the State cites in its motion are but a portion of the applicable new literature addressing the dangers of deregulating the widespread public carry of loaded firearms.

Given Plaintiffs' apparent goal of having the 7-year-old *Woollard* decision overturned by either the *en banc* Fourth Circuit or the United States Supreme Court (*see* Complaint ¶ 6; *Malpasso*, 767 F. App'x at 525), and their own allusion to factual material post-dating *Woollard* (*see* Complaint ¶¶ 48, 49)*,* it is appropriate for the Court to consider additional social science evidence confirming *Woollard*'s intermediate scrutiny ruling.[6] Recent and reliable new research demonstrates that Maryland's concealed carry regulations do more than strike an "appropriate balance" between granting handgun permits and reducing the risk of armed violence. *Woollard*, 712 F.3d at 881. The research shows that Maryland's regulations are not only appropriate and constitutional, but also the best-informed policy choice the state could make to protect the people of Maryland from increased rates of violent crime and homicide. The Court should dismiss Plaintiffs' complaint based on *Woollard* and the additional evidence confirming that ruling is correct.

## ARGUMENT

I. **Compelling New Empirical Evidence Confirms the Constitutionality of the Good Reason Requirement Under Intermediate Scrutiny.**

   A. **Maryland has Substantial State Interests in Regulating Concealed Handguns.**

*Masciandaro* and *Woollard* held that regulations affecting the public carry of firearms are

---

[6] As the State has argued, the Court may take judicial notice of "matters of public record" including "publicly available statistics." Mem. In Support of Defendants' Mot. To Dismiss at 7, n.2 (citing *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Hall v. Virginia*, 385 F.3d 411, 424 n.3 (4th Cir. 2004)). Amicus briefs presenting empirical research, also known as Brandeis briefs, are a "well-known technique for asking the court to take judicial notice of social facts," including social science evidence. *McCleskey v. Kemp*, 753 F.2d 877, 888 (11th Cir. 1985), *aff'd*, 481 U.S. 279 (1987).

reviewable under intermediate scrutiny. This level of means-end scrutiny requires Maryland to demonstrate that its good-and-substantial-reason requirement (hereinafter, the "good reason requirement") is "reasonably adapted to a substantial governmental interest." *Masciandaro*, 638 F.3d at 471. There is no doubt that "protecting public safety and preventing crime—particularly violent crime committed with handguns," *Woollard*, 712 F.3d at 876, remains as substantial a state interest today as it was when the Fourth Circuit decided *Woollard*.

### B. New Evidence Bolsters *Woollard*'s Holding that Maryland's Regulations Are Reasonably Adapted to Substantial State Interests.

New and compelling evidence demonstrates that states that allow public concealed carry of guns without imposing meaningful standards have experienced increased rates of violent crime and homicide. This growing body of research supplies strong and specific evidence that Maryland's law will effectively lower violent crime and further justifies the State's adoption of the good reason requirement.

#### 1. Permissive Concealed Carry Laws Are Associated with Higher Levels of Violent Crime.

Empirical evidence confirms that carrying firearms in public increases the risk of injury for the carrier and others. In the years since *Woollard*, persuasive new social science evidence has confirmed more conclusively that permissive "shall-issue" concealed carry laws fuel violent crime and homicide.[7] With the benefit of the latest and most robust evidence, it is now clearer than before that Maryland's good reason requirement is substantially related to reducing armed

---

[7] "Shall-issue" states require officials to grant handgun carry permits as long as applicants satisfy basic criteria (*e.g.*, no felony convictions). In contrast, "may issue" regimes, like the one at issue here, provide permitting officials more discretion in issuing carry permits. Michael Siegel, et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 Am. J. Pub. Health 1923, 1924-28 (Dec. 2017), https://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2017.304057.

violence.

First, a major empirical study—spanning several decades—by Stanford professor John Donohue and colleagues shows persistent increases in the rates of violent assaults and other violent crimes in states with more lenient "shall-issue" concealed carry permitting systems (referred to as "right-to-carry" or "RTC" laws by the study's authors).[8] The study examined 33 states that adopted RTC laws between 1981 and 2007.[9] The study's model controlled for numerous factors that influence crime to evaluate whether the results were causally related to the RTC law and found that the passage of relaxed public carry laws increased violent crime rates by 13 to 15 percent compared to what the rates otherwise would have been.[10] The researchers also found that the pernicious effect of these laws increased over time, noting that, "the longer the RTC law is in effect [], the greater the cost in terms of increased violent crime."[11] In contrast, there was no indication that RTC laws reduce violent crime,[12] controverting Plaintiffs' assertion that having more people carrying hidden guns will be useful in responding to the "increasing potential of crime and civil unrest" they attribute to the current public health crisis (Complaint ¶

---

[8] John Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Stud. 198, 200 (2019). The 2019 paper builds on earlier research by Donohue et al. from 2018 and 2017, with similar results. John J. Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data, the LASSO, and a State-Level Synthetic Controls Analysis*, Nat'l Bureau Econ. Res. (June 2017, revised Jan. 2018), http://www.nber.org/papers/w23510.

[9] John Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Stud. 198, 200 (2019).

[10] *Id.* at 200, 240.

[11] *Id.* at 232.

[12] *Id. at 240.*

48).  Indeed, the evidence shows the opposite:  in states that have never adopted RTC carry laws, including Hawaii, the decline in violent crime was nearly *ten times* greater than in states that did adopt RTC laws.[13]

Supplying additional evidence supporting the regulation of concealed gun carrying, a 2017 study by researchers at Boston University and Duke University examined the specific impact of concealed carry laws on handgun versus long-gun homicide rates.  This distinction is important.  If permissive concealed carry laws actually deter crime — as advocates for RTC laws often argue — then gun homicides should be expected to decrease in states with shall-issue laws, and there should be no observable increase in handgun homicides.  The Boston-Duke University study, however, found that the opposite occurred.[14]  The study found that shall-issue laws were significantly associated with 6.5% higher total homicide rates, 8.6% higher firearm homicide rates, and 10.6% higher handgun homicide rates, but were not significantly associated with long-gun or non-firearm homicides.[15]  The fact that the homicide increase is attributable to handguns in particular bolsters the study's hypothesis that lax handgun concealed carry laws are responsible for homicide increases.[16]  The study's conclusion that permissive concealed carry laws substantially increase gun homicide rates means that conversely, Maryland's decision to apply a higher standard for concealed carry substantially furthers safety by protecting the public from firearm homicide.

Two other recent studies have also found a noteworthy association between increased

---

[13] *Id.* at 213–14 & fig. 1.
[14] *See* Siegel et al., *supra* note 7.
[15] *Id.* at 1927–28.
[16] *Id.* at 1928.

rates of homicide and state RTC laws that impose minimal or no standards for obtaining a license to carry a concealed firearm.[17] Other researchers have similarly found a strong connection between lax concealed carry licensing laws and increased gun violence,[18] and found that the risk of gun theft triples for people who even occasionally carry firearms,[19] leading to increases in the number of guns circulating in the black market, and available to individuals legally prohibited from purchasing them.  In sum, the strong empirical evidence that has recently emerged is more than sufficient to allow this Court to confirm the correctness of the Fourth Circuit's determination in *Woollard* that Maryland's good reason requirement survives intermediate scrutiny.

### 2. Firearms Are Rarely Used in Self-Defense and Do Not Increase Safety.

There is also a growing consensus that carrying firearms in public for self-defense produces no safety benefits and likely exposes gun carriers to greater harm.  Recent research

---

[17] Cassandra Crifasi et al., *Association Between Firearm Laws and Homicide in Urban Counties*, 95 J. Urb. Health 773, 773–74 (2018) (finding that "permit-to-purchase" laws were associated with a 14 percent reduction in firearm homicide in large, urban counties and that "right to carry" and "stand your ground" laws were associated with increases in firearm homicide); Mark Gius, *Using the Synthetic Control Method to Determine the Effects of Concealed Carry Laws on State-Level Murder Rates*, 57 Int'l Rev. L. & Econ. 1, 6 (2019) (finding that states that changed from "prohibited" concealed carry laws to "shall issue" concealed carry laws experienced a 12.3 percent increase in gun-related murder rates and a 4.9 percent increase in overall murder rates).

[18] *See, e.g.*, Rashna Ginwalla et al., *Repeal of the Concealed Weapons Law and Its Impact on Gun-Related Injuries and Deaths*, 76 J. Trauma Acute Care Surg. 569, 569, 573 (2014) (lax concealed carry permitting laws are associated with increased gun fatalities); Paul Zimmerman, *The Deterrence of Crime through Private Security Efforts: Theory and Evidence*, 37 Int'l. Rev. L. & Econ. 66, 66–75 (2014) (finding a statistically significant increase in murder, robbery, assault, burglary, and larceny in states that enacted shall-issue carry laws from 1999 to 2008).

[19] David Hemenway et al., *Whose Guns are Stolen? The Epidemiology of Gun Theft Victims*, 4 *Injury Epidemiology* 1, 3 (2017) (study finding a threefold gun theft risk for people who carried firearms at least once in the past month).

8

confirms that crime victims rarely use guns in self-defense and that persons carrying firearms are, in fact, no safer than other crime victims. A 2015 study found that victims of violent crimes use firearms in less than one percent of all criminal incidents.[20] And, compared to other self-protective actions that do not involve a firearm, data from the National Crime Victimization Surveys provide little evidence that defensive gun use is beneficial in reducing the likelihood of injury or property loss.[21] A 2019 analysis of data from the FBI's Uniform Crime Reporting program confirmed that while guns can be, and sometimes are, successfully used for defense, these cases are the exception.[22]

This research is consistent with the findings of an influential 2009 study that concluded that carrying a firearm may *increase* a victim's risk of injury during the commission of a crime. In an analysis of 677 shootings over a two-and-a-half-year period in Philadelphia, researchers found, after adjusting for confounding factors, that individuals carrying a gun were 4.46 times more likely to be shot in an assault than those not carrying a gun, and they were more than 4.23 times as likely to be fatally shot.[23] The figures are higher for assaults where it was confirmed that the victim had some opportunity to resist. In these cases, individuals carrying guns were

---

[20] *See* David Hemenway & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007–2011*, 79 Preventive Med. 22, 23 (2015).

[21] *See id.* at 23–24.

[22] Violence Policy Ctr., *Firearm Justifiable Homicides and Non-Fatal Self-Defense Gun Use* (July 2019), https://vpc.org/studies/justifiable19.pdf ("When analyzing the most reliable data available, what is more striking is that in a nation of more than 300 million guns, how *rarely* firearms are used in self-defense.").

[23] *See* Charles C. Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Pub. Health 2034, 2037 (Nov. 2009), https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2008.143099.

5.45 times more likely to be shot.[24]

The 2009 study was bolstered by a 2016 report from public health experts at Johns Hopkins University, which observed that defending oneself with a gun in public requires skills that few possess. "Shooting accurately and making appropriate judgments about when and how to shoot in chaotic, high-stress situations requires a high level of familiarity with tactics and the ability to manage stress under intense pressure."[25] Accuracy "is influenced by distance, the opponent shooter's actions, lighting, use of cover, type of gun, and more."[26] The report confirmed that most people simply do not have the tactical ability to successfully use a gun for self-defense, particularly in urban or densely populated public areas, and may end up "wounding or killing innocent victims" if they attempt to do so.[27]

Moreover, regardless of their degree of tactical training, recent examples demonstrate that when individuals carry guns in public, there is an increased risk that they will wield their firearm in situations that actually place themselves and others in greater danger. Gun carriers—even those with training—have injured innocent people after mistakenly perceiving a threat.[28]

---

[24] *See id.*

[25] Daniel W. Webster et al., *Firearms on College Campuses: Research Evidence and Policy Implications,* Johns Hopkins Bloomberg School of Public Health, 11 (Oct. 15, 2016).

[26] *Id.*

[27] *Id.*

[28] Fox4News.com Staff, *Police: Man Arrested for Shooting Uber Driver Thought He Was Helping*, Fox 4 News (May 16, 2017), http://www.fox4news.com/news/man-spots-gun-inadvertently-shoots-uber-driver (an army veteran shot a driver mistakenly believing he was stopping a robbery); William Saletan, *Friendly Firearms: How an Armed Hero Nearly Shot the Wrong Man*, Slate (Jan. 11, 2011), http://www.slate.com/articles/health_and_science/human_nature/2011/01/friendly_firearms.html (during the 2011 mass shooting in Tucson perpetrated by a gunman targeting U.S. Congresswoman Gabrielle Giffords, a bystander with a concealed gun assaulted and nearly shot the man who had grabbed the shooter's weapon).

The presence of a gun can also exacerbate everyday disputes into lethal confrontations.  In 2017, "road rage" incidents involving gun carriers increased nationally, and the Maryland State Police reported that its officers "encounter this kind of behavior daily."[29]

## II.     Plaintiffs' First Amendment Analogy Cannot Sustain Their Complaint.

Faced with binding precedent that forecloses their claims and an emerging body of empirical evidence suggesting that lenient concealed carry laws endanger the public, Plaintiffs turn to First Amendment law and grasp for support by analogy.  The Complaint suggests that Maryland's good reason requirement for concealed carry permits is "akin to a state law concluding that the general desire to advocate for lawful political change is not a sufficiently 'good and substantial reason' to exercise the right to free speech," an interpretation which would "gut" the First Amendment.  *See* Compl. (Dkt. No. 1) at ¶ 3.

The substantive differences between the First and Second Amendments render this analogy inapposite.  *Heller* importantly stated that "the right secured by the Second Amendment is not unlimited" and that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  *Heller*, 554 U.S. at 626.  *Heller* itself thus strongly affirms that it *is* lawful for governments to adopt public-safety-promoting regulations that have the effect of limiting the carry of concealed guns in public.  This differentiates gun rights, and particularly the public carrying of guns, from free speech.  *See Berron v. Ill. Concealed Carry Licensing Review Bd.*,

---

[29] Kimberly Eiten, *Alarming, Rising Trend: Weapons Used During Road Rage Incidents*, CBS Baltimore (Apr. 10, 2017), http://baltimore.cbslocal.com/2017/04/10/alarming-rising-trend-weapons-used-during-road-rage-incidents/.  Even law enforcement officials have drawn guns in road rage incidents, suggesting that the presence of a gun can dangerously escalate disputes no matter how well-trained the carrier is.  Associated Press, *Federal Agent in Road Rage Pulls Gun on Civilian in Maryland* (Apr. 11, 2018), https://www.washingtontimes.com/news/2018/apr/11/federal-agent-in-road-rage-pulls-gun-on-civilian-i/.

825 F.3d 843, 847 (7th Cir. 2016) ("[E]veryone is entitled to speak and write, but not everyone is entitled to carry a concealed firearm in public.").

Plaintiffs' effort to import First Amendment principles wholesale into the Second Amendment context is unavailing for the additional reason that, unlike First Amendment-protected expressive content, firearms can physically injure and kill people. *See, e.g.*, *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("The risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights" that "can be exercised without creating a direct risk to others."). This distinction—and *Heller*'s recognition that concealed carry bans were historically considered constitutional—must make it permissible for governments to regulate the lethal effects of firearms in ways that might be impermissible if applied to purely expressive activity.

Although this Court and many others have correctly determined that methodological analogies between the two rights can be useful,[30] gun rights and speech rights differ sufficiently that it makes little sense to apply substantive First Amendment doctrine in Second Amendment challenges. *See, e.g.*, *Woollard*, 712 F.3d at 883 n.11 ("We are hesitant to import substantive First Amendment principles wholesale into Second Amendment jurisprudence." (internal citation omitted)); *see also Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 688–90 (9th Cir. 2017) (en banc) (cataloging salient substantive differences between the First and Second Amendments).

## CONCLUSION

Plaintiffs have offered no basis for concluding that Maryland's good-and-substantial-reason requirement violates the Second Amendment, and no reason to depart from sound,

---

[30] *See* John Donohue et al., *supra* note 8 (discussing how First Amendment methodology informs the proper application of intermediate scrutiny in Second Amendment cases).

12

binding Circuit precedent.  The growing empirical consensus that laws like Maryland's save lives confirms that *Woollard* is correct and supplies an additional basis to dismiss the Complaint.  This Court should therefore grant Defendant's Motion to Dismiss.

Respectfully submitted,

/s/*Daniel T. Grant*

DANIEL T. GRANT  (BAR NO. 19659)
NANDINI SINGH
ALLISON M. WHELAN
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
dgrant@cov.com

CLIFFORD D. MPARE, JR.
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
(424) 332-4800

SIMON J. FRANKEL
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111
(415) 591-6000

HANNAH SHEARER
GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE
268 Bush St. # 555
San Francisco, CA 94104
(415) 433-2062

J. ADAM SKAGGS
GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE
223 West 38th St. # 90
New York, NY 10018
(917) 680-3473

December 14, 2020                              Attorneys for *Amicus Curiae*
                                               Giffords Law Center to Prevent Gun
                                               Violence