# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

ERIC CALL, et al.,

*Plaintiffs,*

v.

WOODROW JONES III, et al.

*Defendants.*

Civil Action No.
1:20-cv-3304-DKC

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS**

PETER A. HOLLAND (FED. BAR NO. 10866)
EMANWEL TURNBULL (FED. BAR NO. 19674)
THE HOLLAND LAW FIRM, P.C.
914 Bay Ridge Road, Suite 230
Annapolis, MD 21403
(410) 280-6133
*eturnbull@hollandlawfirm.com*

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

December 14, 2020

*Counsel for Amicus Curiae
Everytown for Gun Safety*

**CORPORATE DISCLOSURE STATEMENT**

Everytown for Gun Safety (formally, "Everytown for Gun Safety Action Fund") has no parent corporations. It has no stock, and hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

Introduction and Interest of Amicus Curiae ....................................................................1

Argument .........................................................................................................................3

    A.    "Longstanding" laws are deemed constitutional under *Heller* because they are consistent with our "historical tradition." ...........................................3

    B.    Maryland's law has a centuries-long pedigree in Anglo-American history and is therefore "longstanding" and constitutional under *Heller*.................4

        1.    English History.......................................................................................4

            Beginning in 1328, England broadly prohibits public carry .................4

            The Statute of Northampton's public-carry prohibition remains fully in effect following the English Bill of Rights of 1689. ....................5

        2.    Founding-Era American History ............................................................6

            The legal authorities most influential to the founding generation interpret the Statute of Northampton to prohibit public carry .........................................................................................6

            The colonies begin adopting England's tradition of public-carry regulation. .........................................................................................7

            Many states enact laws mirroring the Statute of Northampton both before and after the Constitution's adoption..............................7

        3.    Early-19th-Century American History .................................................9

            Many states enact a variant of the Statute of Northampton, allowing public carry with "reasonable cause to fear an assault."............................................................................................9

            Taking a different approach, many southern states elect to permit public carry, while regulating the manner of carry.................11

        4.    Mid-to-Late-19th-Century and Early-20th Century American History..........................................................................................13

            States continue to restrict public carry both before and after the 14th Amendment's ratification. ..........................................................13

Conclusion ......................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Chune v. Piott,*
  80 Eng. Rep. 1161 (K.B. 1615) ............................................................. 6

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ................................................................. *passim*

*English v. State,*
  35 Tex. 473 (1871) ......................................................................... 12

*Gould v. Morgan,*
  907 F.3d 659 (1st Cir. 2018), *cert. denied*, No. 18-1272 (June 15, 2020) ................ 11

*King v. Hutchinson,*
  168 Eng. Rep. 273 (1784) ................................................................... 8

*Malpasso v. Pallozzi,*
  767 F. App'x 525 (4th Cir. 2019), *cert. denied*, No. 19-423 (June 15, 2020) ............. 2

*Nunn v. State,*
  1 Ga. 243 (1846) .......................................................................... 13

*Payton v. New York,*
  445 U.S. 573 (1980) ........................................................................ 6

*Peruta v. Cty. of San Diego,*
  824 F.3d 919 (9th Cir. 2016) *(en banc)* ................................................... 4

*State v. Barnett,*
  34 W. Va. 74 (1890) ....................................................................... 13

*State v. Duke,*
  42 Tex. 455 (1874) ........................................................................ 12

*State v. Smith,*
  11 La. Ann. 633 (1856) .................................................................... 13

*State v. Workman,*
  35 W. Va. 367 (1891) ...................................................................... 13

*United States v. Chester,*
  628 F.3d 673 (4th Cir. 2010) ............................................................... 3

*United States v. Hosford,*
  843 F.3d 161 (4th Cir. 2016) .............................................................. 14

*United States v. Rene E.*,
   583 F.3d 8 (1st Cir. 2009) ................................................................................................. 3

*Woollard v. Gallagher*,
   712 F.3d 865 (4th Cir. 2013) ......................................................................................... 2, 3

*Wrenn v. District of Columbia*,
   864 F.3d 650 (D.C. Cir. 2017) ........................................................................................ 11

*Young v. Hawaii*,
   896 F.3d 1044 (9th Cir. 2018), *reh'g en banc granted*, 915 F.3d 681 (9th Cir. 2019) .............................. 11

## American Statutes

1686 N.J. Laws 289, ch. 9 ........................................................................................................ 7

1694 Mass. Laws 12, no. 6. ...................................................................................................... 7

1699 N.H. Laws 1 .................................................................................................................. 8

1786 Va. Laws 33, ch. 21 ..................................................................................................... 8, 12

1792 N.C. Laws 60, ch. 3 ....................................................................................................... 8

1795 Mass. Laws 436, ch. 2 ................................................................................................... 8

1801 Tenn. Laws 259 ............................................................................................................ 10

1801 Tenn. Laws 710, § 6 ...................................................................................................... 8

1821 Me. Laws 285, ch. 76, § 1 .............................................................................................. 8

1836 Mass. Laws 750, § 16 .................................................................................................. 9, 10

1838 Wisc. Laws 381, § 16 ..................................................................................................... 10

1841 Me. Laws 709, ch. 169, § 16 ......................................................................................... 10

1846 Mich. Laws 690, ch. 162, § 16 ...................................................................................... 10

1847 Va. Laws 127, ch. 14 ......................................................................................... 10, 11, 12, 14

1851 Minn. Laws 526-28, ch. 112 ..................................................................................... 9, 10, 11

1852 Del. Laws 330, ch. 97, § 13 ........................................................................................... 8

1853 Or. Laws 218, ch. 16, § 17 ............................................................................................ 10

1854 Ala. Laws 588, § 3272 ................................................................................................... 11

1857 D.C. Laws 567, ch. 141, § 15 ............................................................14

1859 N.M. Laws 94, § 2 ............................................................................14

1861 Ga. Laws 859, § 4413 ........................................................................11

1861 Pa. Laws 248, § 6 ..............................................................................10

1869 N.M. Laws 312, § 1 ............................................................................14

1870 S.C. Laws 403, no. 288, § 4 ...............................................................12

1870 W. Va. Laws 702, 703, ch. 153, § 8 ..............................................12, 14

1871 Tex. Laws 1322, art. 6512 ........................................................10, 12, 14

1873 Minn. Laws. 1025, § 17 ......................................................................11

1875 Wyo. Laws 352, ch. 52, § 1 .................................................................14

1889 Ariz. Laws 16, ch. 13, § 1 ...................................................................14

1889 Idaho Laws 23, § 1 .............................................................................14

1891 W. Va. Laws 915, ch. 148, § 7 .............................................................14

1901 Mich. Laws 687, § 8 ...........................................................................14

1903 Okla. Laws 643, ch. 25, art. 45, § 584 ................................................14

1906 Mass. Sess. Laws 150 § 1 ...................................................................14

1909 Ala. Laws 258, no. 215, §§ 2, 4 ...........................................................14

1909 Tex. Laws 105 ....................................................................................14

1913 Haw. Sess. Laws 25, act 22, § 1 ..........................................................14

1913 N.Y. Laws 1627 ..................................................................................14

Mass. Gen. Laws ch. 275, § 4 .......................................................................9

Md. Code Ann., Crim. Law § 4-203(b) ..........................................................1

Md. Code Ann., Pub. Safety § 5-306(a) .........................................................1

**American Municipal Ordinances**

Checotah, Okla., Ordinance no. 11 (1890) ...................................................14

Dallas, Tex., Ordinance (1887) ................................................................................14

La Crosse, Wis., Ordinance no. 14 (1880) ...............................................................14

Los Angeles, Cal., Ordinance nos. 35-36 (1878) ....................................................14

Nashville, Tenn., Ordinance ch. 108 (1873) ...........................................................14

Nebraska City, Neb., Ordinance no. 7 (1872) ........................................................14

New Haven, Conn., Ordinances § 192 (1890) .........................................................14

Rawlins, Wyo., Rev. Ordinances art. 7 (1893) ........................................................14

Salina, Kan., Ordinance no. 268 (1879) ..................................................................14

San Antonio, Tex., Ordinance ch. 10 (1899) ...........................................................14

Syracuse, N.Y., Ordinances ch. 27 (1885) ...............................................................14

Washington, D.C., Ordinance ch. 5 (1857) .............................................................14

Wichita, Kan., Ordinance no. 1641 (1899) .............................................................14

**Constitutional Provisions**

Md. Const. of 1776, art. III, § 1.................................................................................8

**English Statutes and Royal Proclamations**

20 Ric. 2, 93, ch. 1 (1396)..........................................................................................4

7 Ric. 2, 35, ch. 13 (1383) ..........................................................................................4

English Bill of Rights of 1689, 1 W. & M. st. 2. c. 2 .................................................5

Statute of Northampton, 2 Edw. 3, 258, ch. 3 (1328) ...............................................4

**Books, Articles, and Historical Materials**

*City Intelligence*, Boston Courier (Mass.), Mar. 7, 1853....................................................10

Edward Coke,
   *The Third Part of the Institutes of the Laws of England* (1817 reprint) ....................................6

Eric M. Ruben & Saul A. Cornell,
   *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125
   Yale L.J. Forum 121 (Sept. 25, 2015) ....................................................... 9, 12

Francis Wharton,
   *A Treatise on the Criminal Law of the United States* (1846) ................................................ 9

Harris, *The Right to Bear Arms in English and Irish Historical Context, in A Right to Bear
   Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 23
   (Tucker et al. eds., 2019) ................................................................................ 5-6

James Ewing,
   *A Treatise on the Office & Duty of a Justice of the Peace* 546 (1805) ....................... 9

Joel Prentiss Bishop,
   *Commentaries on the Law of Statutory Crimes* (1873) ....................................... 8, 9

John Bond,
   *A Compleat Guide for Justices of the Peace* (1707) ........................................... 7

John Haywood,
   *A Manual of the Laws of North-Carolina* (1814) ................................................ 8

John Haywood,
   *The Duty & Authority of Justices of the Peace, in the State of Tennessee* (1810) ........ 9

John Haywood,
   *The Duty and Office of Justices of the Peace, and of Sheriffs, Coronoers, Constables* (1800) ...... 9

Jonathan Meltzer,
   *Open Carry for All*, 123 Yale L.J. 1486 (2014) ................................................. 7

Joseph Keble,
   *An Assistance to the Justices of the Peace, for the Easier Performance of Their Duty* (1683) ...... 5

Patrick J. Charles,
   The Faces of the Second Amendment Outside the Home, 60 Clev. St. L. Rev. 1
   (2012) .................................................................................. 4, 5, 7, 8

Patrick J. Charles,
   *The Statute of Northampton by the Late Eighteenth Century*, 41 Fordham Urb. L.J. 1695
   (2012) .............................................................................................. 6

Recent Case, 132 Harv. L. Rev. 2066 (2019) ......................................................... 12

Robert Gardiner,
   *The Compleat Constable* (1692) ................................................................ 5

Saul Cornell,
   *The Right to Carry Firearms Outside of the Home*, 39 Fordham Urb. L.J. 1695 (2012) ...... 10

Sir William Oldnall Russell,
   *A Treatise on Crimes & Misdemeanors* 124 (1826) ............................................. 8

*When and Where May a Man Go Armed*, S.F. Bulletin, Oct. 26, 1866 ....................................................14

William Blackstone,
   *Commentaries on the Laws of England* (1769) .................................................................................. 5, 6

William Hawkins,
   *A Treatise of the Pleas of the Crown* (1721) ........................................................................................8

## INTRODUCTION AND INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly six million supporters across the nation, including more than a hundred and fifty thousand in Maryland. Everytown's mission includes defending gun laws through the filing of amicus briefs that provide historical context and doctrinal analysis that might otherwise be overlooked. *See, e.g.*, *Malpasso v. Pallozzi*, No. 18–2377 (4th Cir.); *Young v. Hawaii*, No. 12–17808 (9th Cir.) (en banc); *Wrenn v. District of Columbia*, No. 16–7025 (D.C. Cir.).[1]

This case involves a Second Amendment challenge to Maryland's regulatory scheme for carrying handguns in public. Maryland does not ban all public carry, but instead takes an approach like that of seven other states, collectively expressing the popular will of more than a quarter of the American people. Its law has two important parts. First, it allows people to carry a handgun without a license under a variety of circumstances, including in one's home or business or on property one owns, while hunting or target-shooting, and while traveling in between. Md. Code Ann., Crim. Law § 4-203(b). Second, it permits people to carry a handgun under other circumstances upon a showing that they have "good and substantial reason" to do so, which is satisfied by establishing that "the permit is necessary as a reasonable precaution against apprehended danger," but is not satisfied by generalized fear for personal safety. Md. Code Ann., Pub. Safety § 5-306(a).

The Fourth Circuit has adopted a "two-part approach" to Second Amendment challenges like this one, first asking whether the law "burdens conduct that was within the scope of the Second

---

[1] The historical gun laws cited in this brief are available in the Appendix to Everytown's brief in *Malpasso v. Pallozzi*, No. 1:18-cv-01064, Dkt. No. 17, 17-1 (filed June 21, 2018). Everytown submits this brief on motion for leave to file. Defendants consent to Everytown's motion for leave, and plaintiffs have no objection to this motion.  No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

Amendment as historically understood," and then determining, if so, whether the law satisfies "an appropriate form of means-end scrutiny." *Woollard v. Gallagher*, 712 F.3d 865, 874–75 (4th Cir. 2013) (quotation marks omitted). As the plaintiffs acknowledge, the Fourth Circuit held in *Woollard* that Maryland's public-carry regime "passes constitutional muster" under intermediate scrutiny. *Id.* at 876.[2] In so doing, the Fourth Circuit "refrain[ed] from any assessment" of whether the regime "implicates Second Amendment protections" as historically understood—the step-one inquiry— and instead "merely assume[d]" that it did. 712 F.3d at 876. In the seven years since *Woollard* was decided, however, a wealth of historical materials has come to light showing that there is a deep Anglo-American tradition of restricting public carry. *See generally, e.g.*, Repository of Historical Gun Laws, Duke University School of Law, https://law.duke.edu/gunlaws/. This tradition makes clear that Maryland's law should be upheld at step one of the analysis, because it is sufficiently "longstanding" to qualify as constitutional under *District of Columbia v. Heller*, 554 U.S. 570 (2008).

This brief sets out the historical tradition of regulating public carry. For centuries, English law broadly prohibited anyone from carrying a dangerous weapon in public, beginning with the Statute of Northampton in 1328, and continuing after the English Bill of Rights of 1689. This tradition took hold in America in the 17th and 18th centuries, when several colonies enacted similar restrictions. And it continued into the 19th century, when many states and municipalities broadly prohibited public carry in cities, towns, and villages, while many others did what Maryland does today: allow public carry by those with "reasonable cause to fear an assault or other injury." Although a more permissive approach to public carry began emerging in the South around that time, these antebellum Southern laws did not represent a majority approach.

---

[2] *See also Malpasso v. Pallozzi*, 767 F. App'x 525, 525-26 (4th Cir. 2019) (per curiam) (rejecting prior post-*Woollard* challenge to Maryland's public-carry law and reaffirming that the "ruling in *Woollard* … control[s]"), *cert. denied*, No. 19-423 (June 15, 2020).

Altogether, by the end of the 19th century, nearly 20 states and many cities had enacted laws that either broadly prohibited public carry or required "good reason" to publicly carry a firearm. Because Maryland law carries forward this longstanding tradition, it is constitutional under *Heller*. Such a robust historical pedigree is not necessary to satisfy the Second Amendment, but it is sufficient to do so. Whatever the Amendment's precise contours, there can be no doubt that a law that has its roots in 14th-century England, and is *more* permissive of public carry than dozens of American laws that existed from the founding era through the 19th century, is consistent with our "historical tradition," *id.* at 627, and thus constitutional.

## ARGUMENT

The question in this case is not whether the Second Amendment—which the Supreme Court held in *Heller* protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 635—has any application outside the home. Rather, the question is whether Maryland's "good cause" public-carry regime is consistent with the Amendment's protections (as applied to the states by the 14th Amendment). Although the Fourth Circuit has already held that Maryland's law satisfies the appropriate level of scrutiny at step two of the governing Second Amendment framework, *see Woollard*, 712 F.3d at 876, this brief shows that the analysis need not get that far: the law is also constitutional at step one.

**A.     "Longstanding" laws are deemed constitutional under *Heller* because they are consistent with our "historical tradition."**

One way to determine whether a law burdens the Second Amendment right is to assess the law based on a "historical understanding of the scope of the right," *Heller*, 554 U.S. at 625, and consider whether there is a "longstanding tradition" of "state laws imposing similar restrictions." *United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009); *see, e.g.*, *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (noting the "historical inquiry" required under step one of the Second Amendment

analysis). Here, as the historical record shows, Maryland's "good and substantial reason" requirement embodies a tradition of regulation going back seven centuries, through the founding era, and up to the present day. It is thus longstanding and constitutional under *Heller*.

**B.  Maryland's law has a centuries-long pedigree in Anglo-American history and is therefore "longstanding" and constitutional under *Heller*.**

1.  **English History**

*Beginning in 1328, England broadly prohibits public carry*. Because "the Second Amendment" protects a "right inherited from our English ancestors," *Peruta v. Cty of San Diego*, 824 F.3d 919, 929 (9th Cir. 2016) (en banc) (quoting *Heller*, 554 U.S. at 599) (internal quotation marks omitted), we start with the English history. This history stretches back to at least 1328, when England enacted the Statute of Northampton, providing that "no Man great nor small" shall "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." 2 Edw. 3, 258, ch. 3 (1328).

After this statute was enacted, King Edward III and his successors directed sheriffs and bailiffs to arrest "all those whom [they] shall find going armed." Charles, *The Faces of the Second Amendment Outside the Home*, 60 Clev. St. L. Rev. 1, 13–25 (2012). Over the ensuing decades, England repeatedly reenacted the Statute of Northampton's public-carry prohibition. *See, e.g.*, 7 Ric. 2, 35, ch. 13 (1383); 20 Ric. 2, 93, ch. 1 (1396). Because this prohibition carried misdemeanor penalties, violators were usually required to forfeit their weapons and pay a fine. *Id.*

By the 16th century, firearms had become increasingly accessible in England, and the possibility that they would be carried in public had become increasingly threatening to public safety. To guard against this threat, Queen Elizabeth I in 1579 called for strict enforcement of the Statute of Northampton's prohibition on carrying "Daggers, Pistols, and such like, not only in Cities and Towns, [but] in all parts of the Realm in common high[ways], whereby her Majesty's good quiet

people, desirous to live in [a] peaceable manner, are in fear and danger of their lives." Charles, *Faces*, 60 Clev. St. L. Rev. at 21 (spelling modernized). Fifteen years later, she reaffirmed that publicly carrying pistols—whether "secretly" or in the "open"—was "to the terrour of all people professing to travel and live peaceably." *Id.* at 22.

To enforce the Statute of Northampton's prohibition, British constables, magistrates, and justices of the peace were instructed to "Arrest all such persons as they shall find to carry Daggers or Pistols" publicly. Keble, *An Assistance to the Justices of the Peace, for the Easier Performance of Their Duty* 224 (1683). This mandate was unmistakably broad: "[I]f any person whatsoever . . . shall be so bold as to go or ride Armed, by night or by day, in Fairs, Markets, or any other places . . . then any Constable" may "commit him to the Gaol." *Id.*

***The Statute of Northampton's public-carry prohibition remains fully in effect following the English Bill of Rights of 1689.*** In the late 17th century, William and Mary enshrined the right to have arms in the Declaration of Rights, later codified in the English Bill of Rights in 1689. This right—which "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593—ensured that subjects "may have arms for their defence suitable to their conditions, and as allowed by law." 1 W. & M. st. 2. ch. 2. As Blackstone later wrote, this right was considered "a public allowance, under due restrictions[,] of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." 1 Blackstone, *Commentaries on the Laws of England* 144 (1769). One such "due restriction" was the Statute of Northampton, which remained in effect after the right to bear arms was codified in 1689. *See* 4 Blackstone, *Commentaries* 148–49; Gardiner, *The Compleat Constable* 18 (1692); *Middlesex Sessions: Justices' Working Documents* (1751), *available at* https://goo.gl/x7eX1g (reporting 1751 conviction under law); *see also* Harris, *The Right to Bear Arms in English and Irish Historical Context*, *in A Right to Bear Arms?: The Contested Role of History in Contemporary*

*Debates on the Second Amendment* 23, 33 (Tucker et al. eds., 2019) (concluding that "history demonstrates that the English did not in the late seventeenth century seek to uphold or institute a natural right to bear arms" but "took the view that gun ownership should be controlled by the legislature").

2. **Founding-Era American History**

*The legal authorities most influential to the founding generation interpret the Statute of Northampton to broadly prohibit public carry.* The general understanding of the Statute of Northampton as broadly prohibiting public carry existed in England throughout the 17th and 18th centuries and was adopted by the legal authorities whose views were most influential to the Framers. *See* Charles, *The Statute of Northampton by the Late Eighteenth Century*, 41 Fordham Urb. L.J. City Square 10 (2013). In 1644, for example, Lord Coke—"widely recognized by the American colonists as the greatest authority of his time on the laws of England," *Payton v. New York*, 445 U.S. 573, 593–94 (1980) (internal quotation marks omitted)—described the Statute of Northampton as making it unlawful "to goe nor ride armed by night nor by day . . . in any place whatsoever." Coke, *The Third Part of the Institutes of the Laws of England* 160 (1817 reprint).

One century later, Blackstone—"the preeminent authority on English law for the founding generation," *Heller*, 554 U.S. at 593–94 (internal quotation marks omitted)—described the statute similarly: "The offence of riding or going armed with dangerous or unusual weapons is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton." 4 Blackstone, *Commentaries* 148–49. In other words, because carrying a dangerous weapon (such as a firearm) in public naturally terrified the people, it was a crime against the peace—even if unaccompanied by a threat, violence, or any additional breach of the peace. *See Chune v. Piott*, 80 Eng. Rep. 1161, 1162 (K.B. 1615) ("Without all question, the sheriffe hath power to commit . . . if contrary to the Statute of Northampton, he sees any one to carry

weapons in the high-way, in terrorem populi Regis; he ought to take him, and arrest him, notwithstanding he doth not break the peace.").

*The colonies begin adopting England's tradition of public-carry regulation.* Around the time that the English Bill of Rights was adopted, America began its own public-carry regulation. The first step was a 1686 New Jersey law that sought to prevent the "great fear and quarrels" induced by "several persons wearing swords, daggers, pistols," and "other unusual or unlawful weapons." 1686 N.J. Laws 289, 289–90, ch. 9. To combat this "great abuse," the law provided that no person "shall presume privately to wear any pocket pistol" or "other unusual or unlawful weapons," and "no planter shall ride or go armed with sword, pistol, or dagger," except for "strangers[] travelling" through. *Id.* This was only the start of a long history of regulation "limiting gun use for public safety reasons"—especially the public carry of guns. Meltzer, *Open Carry for All*, 123 Yale L.J. 1486, 1523 (2014). As against this history, "there are no examples from the Founding era of anyone espousing the concept of a general right to carry." *Id.*

*Many states enact laws mirroring the Statute of Northampton both before and after the Constitution's adoption.* Eight years after New Jersey's law, Massachusetts enacted its own version of the Statute of Northampton, authorizing justices of the peace to arrest anyone who "shall ride or go armed Offensively before any of Their Majesties Justices, or other [of] Their Officers or Ministers doing their Office, or elsewhere." 1694 Mass. Laws 12, no. 6.

By using the word "offensively," Massachusetts ensured that this prohibition applied only to "offensive weapons," as it had in England—not *all* arms. Constable oaths of the 18th century described this law with similar language. *See* Charles, *Faces*, 60 Clev. St. L. Rev. at 34 n.178. One treatise, for example, explained that "[a] person going or riding with offensive Arms may be arrested." Bond, *A Compleat Guide for Justices of the Peace* 181 (1707). Thus, under the law, a person could publicly carry a hatchet or horsewhip, but not a pistol. *See* 1 Hawkins, *A Treatise of the Pleas of the*

*Crown* 665 (1721) (1824 reprint) (explaining that hatchets and horsewhips were not "offensive weapons," while "guns, pistols, daggers, and instruments of war" were); *King v. Hutchinson*, 168 Eng. Rep. 273, 274 (1784) (explaining that firearms are offensive weapons).[3]

One century later, Massachusetts reenacted its law, this time as a state. 1795 Mass. Laws 436, ch. 2. Because the law had been in effect for so long, it was "well known to be an offence against law to ride or go with . . . firelocks, or other dangerous weapons," as one newspaper later reported, so it "[could not] be doubted that the vigilant police officers" would arrest violators. Charles, *Faces*, 60 Clev. St. L. Rev. at 33 n.176 (quoting *The Salem Gazette*, June 2, 1818, at 4).

Following Massachusetts's lead, additional states enacted similar laws, including founding-era statutes in Virginia and North Carolina, a New Hampshire law passed five years after Massachusetts's first enactment, and later enactments in states ranging from Maine to Tennessee. *See* 1699 N.H. Laws 1; 1786 Va. Laws 33, ch. 21; 1792 N.C. Laws 60, 61, ch. 3; 1801 Tenn. Laws 710, § 6; 1821 Me. Laws 285, ch. 76, § 1; 1852 Del. Laws 330, 333, ch. 97, § 13. Other states, such as Maryland, incorporated the Statute of Northampton through their state constitutions or common law. *See* Md. Const. of 1776, art. III, § 1.

To enforce these laws, the constables, magistrates, and justices of the peace in these jurisdictions were required to "arrest all such persons as in your sight shall ride or go armed." Haywood, *A Manual of the Laws of North-Carolina* pt. 2 at 40 (1814) (N.C. constable oath). That was because, as constables were informed, "riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land, and is prohibited by

---

[3] American treatises said the same. *See* Bishop, *Commentaries on the Law of Statutory Crimes* 214 (1873); Russell, *A Treatise on Crimes & Misdemeanors* 124 (1826).

statute." Haywood, *The Duty and Office of Justices of the Peace, and of Sheriffs, Coronoers, Constables* 10 (1800); *see also* Haywood, *The Duty & Authority of Justices of the Peace, in the State of Tennessee* 176 (1810).

As with the English statute, prosecution under these laws did not require a "threat[] [to] any person in particular" or "any particular act of violence." Ewing, *A Treatise on the Office & Duty of a Justice of the Peace* 546 (1805); *see also* Bishop, *Commentaries on the Law of Statutory Crimes* (noting that there was no requirement that "peace must actually be broken, to lay the foundation for a criminal proceeding"). Nor did these laws have a self-defense exception: No one could "excuse the wearing [of] such armor in public, by alleging that such a one threatened him." Wharton, *A Treatise on the Criminal Law of the United States* 527–28 (1846).

### 3.  Early-19th-Century American History

***Many states enact a variant of the Statute of Northampton, allowing public carry with "reasonable cause to fear an assault."*** In 1836, Massachusetts amended its public-carry prohibition to provide a narrow exception for those having "reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property." 1836 Mass. Laws 748, 750, ch. 134, § 16. Absent such "reasonable cause," no person could "go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon." *Id.* Those who did so could be punished by being made to pay sureties for violating the statute, *id.*; those who failed to pay could be imprisoned. *See id.* at 749.[4]

---

[4] Sureties were a form of criminal punishment, similar to a bond. *See* Ruben & Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J.F. 121, 131 (2015), https://goo.gl/3pUZHB ("At common law, sureties were similar to present-day guarantors in the bail context: members of the community who would pledge responsibility for the defendant and risk losing the bond if the defendant failed to 'keep the peace.'"). They continue to exist as a form of criminal punishment in some states. *See, e.g.*, Mass. Gen. Laws ch. 275, § 4. The criminal nature of the surety-based historical laws is confirmed by the legislatures that enacted them. The Massachusetts legislature, for example, placed its restriction in Title II of the Code entitled "Of Proceedings in Criminal Cases." 1836 Mass. Laws 748, 750, ch. 134, § 16; *see also, e.g.*, 1851 Minn. Laws at 527–28, §§ 2, 17, 18 ("Persons carrying offensive weapons, how punished.");

Although the legislature chose to trigger these penalties using a citizen-complaint mechanism (allowing "any person having reasonable cause to fear an injury, or breach of the peace" to file a complaint, 1836 Mass. Laws at 750, § 16), the law was understood to restrict carrying firearm in public without good cause. This was so even when the firearm was not used in any threatening or violent manner: The legislature placed the restriction in a section entitled "Persons who go armed may be required to find sureties for the peace," and expressly cited the state's previous enactment of the Statute of Northampton. *Id.* And elsewhere in the same statute the legislature separately punished "any person [who] threatened to commit an offence against the person or property of another." *Id.* at 749, § 2. Thus, as one judge explained in a grand jury charge appearing in the contemporary press in 1837, there was little doubt at the time that "no person may go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to apprehend an assault or violence to his person, family, or property." Cornell, *The Right to Carry Firearms Outside of the Home*, 39 Fordham Urb. L.J. 1695, 1720 & n.134 (2012) (quoting *Judge Thacher's Charges*, Christian Register & Boston Observer, June 10, 1837, at 91).[5]

Within a few decades, many states (all but one outside the slaveholding South) had adopted nearly identical laws.[6] Most copied the Massachusetts law verbatim—enforcing the public-carry

---

1846 Mich. Laws 690, ch. 162 § 16 ("Of Proceedings in Criminal Cases"); 1847 Va. Laws 127, ch. 14, § 16 (same); 1871 Tex. Laws 1322, art. 6512 ("Criminal Code"). If someone continued to violate a gun prohibition after paying sureties, moreover, they would "not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace." 1801 Tenn. Laws 259.

[5] Newspaper articles from the 19th century describe criminal prosecutions under these laws even when the person was carrying a *concealed* weapon—a form of public carry that, by itself, does not indicate any menacing conduct beyond bare carry. *See, e.g.*, *City Intelligence*, Boston Courier (Mass.), Mar. 7, 1853, at 4 (reporting arrest and charge against person for "carrying a concealed weapon," a "loaded pistol").

[6] *See, e.g.*, 1838 Wisc. Laws 381, § 16; 1841 Me. Laws 709, ch. 169, § 16; 1846 Mich. Laws 690, 692, ch. 162, § 16; 1847 Va. Laws 127, 129, ch. 14, § 16; 1851 Minn. Laws 526, 528, ch. 112, § 18; 1853 Or. Laws 218, 220, ch. 16, § 17; 1861 Pa. Laws 248, 250, § 6.

prohibition through a citizen-complaint provision and permitting a narrow self-defense exception. *See, e.g.*, 1851 Minn. Laws at 527–28, §§ 2, 17, 18 (section entitled "Persons carrying offensive weapons, how punished"); 1873 Minn. Laws. 1025, § 17 (same, after the 14th Amendment's ratification). At least one state (Virginia) used  different language. 1847 Va. Laws at 129, § 16 ("If any person shall go armed with any offensive or dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may be required to find sureties for keeping the peace."). Regardless, these laws were understood to do the same thing: broadly restrict public carry, while establishing a limited exception for those with a particular need for self-defense.

***Taking a different approach, many southern states elect to permit public carry, while regulating the manner of carry.*** In contrast to the Northampton model and its good-cause variant, many—but not all—states in the slaveholding South were more permissive of public carry. They generally allowed white citizens to carry firearms in public so long as the weapons were not concealed. *See, e.g.*, 1854 Ala. Laws 588, § 3272; 1861 Ga. Laws 859, § 4413. It is this alternative (and minority) tradition on which a divided panel relied in *Wrenn v. District of Columbia*, 864 F.3d 650, 658 (D.C. Cir. 2017), the key case cited by the plaintiffs (Compl. ¶ 6). *See Gould v. Morgan*, 907 F.3d 659, 669-70 (1st Cir. 2018) (noting that the *Wrenn* panel "relied primarily on historical data derived from the antebellum South"), *cert. denied*, No. 18-1272 (June 15, 2020).

This tradition owes itself to the South's peculiar history and the prominent institution of slavery. *See Young v. Hawaii*, 896 F.3d 1044, 1076-77 (9th Cir. 2018) (Clifton, J., dissenting) ("To suggest that the approach of the antebellum South reflected a national consensus about the Second Amendment's implication for public carry of firearms is misguided."), *reh'g en banc granted*, 915 F.3d 681 (9th Cir. 2019). It reflects "a time, place, and culture where slavery, honor, violence, and the public carrying of weapons were intertwined"—a divergent set of societal norms that "do[es] not

reflect the full range of American legal history." Ruben & Cornell, 125 Yale L.J.F. at 125; *see also* Recent Case, 132 Harv. L. Rev. 2066, 2070-71 (2019).

Even within the South, however, courts and legislatures took varying stances toward public carry. Virginia, for example, enacted a law in 1847 prohibiting public carry absent good cause, after enacting a broad Northampton-style prohibition at the founding. 1847 Va. Laws at 129, § 16 (making it illegal to "go armed with any offensive or dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property"); 1786 Va. Laws 33, ch. 21. South Carolina enacted a Northampton-style law during Reconstruction. 1870 S.C. Laws 403, no. 288, § 4. Around the same time, Texas prohibited public carry with an exception for good cause. 1871 Tex. Laws 1322, art. 6512 (prohibiting public carry absent an "immediate and pressing" self-defense need, while exempting one's "own premises" and "place of business," and travelers "carrying arms with their baggage"). And West Virginia, added to the Union during the Civil War, similarly allowed public carry only upon a showing of good cause. 1870 W. Va. Laws 702, 703, ch. 153, § 8.

Furthermore, even as Southern legislatures took varied positions on public carry, Southern courts recognized the constitutionality of good-cause open-carry restrictions. The Texas Supreme Court, for instance, twice upheld that state's good-cause requirement. *English v. State*, 35 Tex. 473 (1871); *State v. Duke*, 42 Tex. 455 (1874). In 1874, it called the law—which prohibited carrying "any pistol" in public without good cause, 1871 Tex. Laws 1322, art. 6512—"a legitimate and highly proper regulation." 42 Tex. at 459. Three years earlier, the court noted that it would be "little short of ridiculous" for a citizen to "claim the right to carry" a pistol where people congregate. 35 Tex. at 477-79. Further, the court observed, the good-cause requirement was "not peculiar to our own state," for nearly "every one of the states of this Union ha[d] a similar law upon their statute books," and many had laws that were "more rigorous than the act under consideration." *Id.* at 479.

Nor were these cases outliers. Other courts upheld similar good-cause laws against constitutional attacks. *See, e.g.*, *State v. Workman*, 35 W. Va. 367, 367 (1891) (upholding West Virginia's good-cause requirement, which the court had previously interpreted, in *State v. Barnett*, 34 W. Va. 74 (1890), to require specific, credible evidence of an actual threat of violence, and not an "idle threat").

By contrast, there is no historical case (Southern or otherwise) striking down a good-cause requirement as unconstitutional. To be sure, a couple of cases, in the course of approving concealed-carry prohibitions, expressed the view that the right to bear arms protects the right, under some circumstances, to openly carry a weapon in public. *See Nunn v. State*, 1 Ga. 243 (1846). But even within the South, open carry was rare: The Louisiana Supreme Court, for example, referred to "the extremely unusual case of the carrying of such weapon in full open view." *State v. Smith*, 11 La. Ann. 633, 634 (1856). And Maryland's law, of course, does not go nearly as far as the one struck down in *Nunn*, which prohibited *any* form of public carry, and banned most handguns. At any rate, isolated snippets from a few antebellum Southern state-court decisions cannot trump the considered judgments of countless legislatures and courts throughout our nation's history, which enacted and upheld such laws without casting doubt on their constitutionality.

### 4.  Mid-to-Late-19th-Century and Early-20th-Century American History

***States continue to restrict public carry both before and after the 14th Amendment's ratification.*** During the second half of the 19th century and into the early 20th century, additional jurisdictions began enacting laws broadly restricting public carry, often subject to limited self-defense exceptions. Over a dozen state laws from this time period were at least as

restrictive as the Maryland regime at issue here.[7] And there were countless such municipal ordinances as well.[8]

These mid-to-late-19th century and early 20th century laws either entirely prohibited public carry or required a good cause. Thus, even if the English and early American history had not already established the constitutionality of such restrictions, these laws—by themselves—would be enough to uphold Maryland's public-carry law as constitutional under *Heller. See, e.g.*, *United States v. Hosford*, 843 F.3d 161, 166-67 (4th Cir. 2016) (20th-century laws may qualify as longstanding).

*     *     *

In sum, a long tradition of American law makes clear that restrictions on the public carry of firearms—including laws limiting public carry to circumstances where one had good cause to fear an imminent threat—were historically understood to be outside the scope of the Second Amendment. Maryland's public-carry regime fits squarely within that historical tradition, and it is therefore longstanding and constitutional.

---

[7] *See, e.g.*, 1859 N.M. Laws 94, § 2; 1847 Va. Laws 127, ch. 14, § 15; 1857 D.C. Laws 567, ch. 141, § 15; 1869 N.M. Laws 312, § 1; 1870 W. Va. Laws 702, ch. 153, § 8; 1871 Tex. Laws 1322, art. 6512; 1875 Wyo. Laws 352, ch. 52, § 1; 1889 Ariz. Laws 16, ch. 13, § 1; 1889 Idaho Laws 23, § 1; 1891 W. Va. Laws 915, ch. 148, § 7; 1901 Mich. Laws 687, § 8; 1903 Okla. Laws 643, ch. 25, art. 45, § 584; 1906 Mass. Sess. Laws 150 § 1; 1909 Ala. Laws 258, no. 215, §§ 2, 4; 1909 Tex. Laws 105; 1913 Haw. Sess. Laws 25, act 22, § 1; 1913 N.Y. Laws 1627.

[8] *See, e.g.*, Washington, D.C., Ordinance ch. 5 (1857); Nebraska City, Neb., Ordinance no. 7 (1872); Nashville, Tenn., Ordinance ch. 108 (1873); Los Angeles, Cal., Ordinance nos. 35–36 (1878); Salina, Kan., Ordinance no. 268 (1879); La Crosse, Wis., Ordinance no. 14, § 15 (1880); Syracuse, N.Y., Ordinances ch. 27 (1885); Dallas, Tex., Ordinance (1887); New Haven, Conn., Ordinances § 192 (1890); Checotah, Okla., Ordinance no. 11 (1890); Rawlins, Wyo., Ordinances art. 7 (1893); Wichita, Kan., Ordinance no. 1641 (1899); San Antonio, Tex., Ordinance ch. 10 (1899); *When and Where May a Man Go Armed*, S.F. Bulletin, Oct. 26, 1866, at 5 ("[San Francisco] ordains that no person can carry deadly weapons.").

## CONCLUSION

This Court should grant the defendants' motion to dismiss.

Respectfully submitted,
*/s/ Emanwel Turnbull*

PETER A. HOLLAND (FED. BAR NO. 10866)
EMANWEL TURNBULL (FED. BAR NO. 19674)
THE HOLLAND LAW FIRM, P.C.
914 Bay Ridge Road, Suite 230
Annapolis, MD 21403
(410) 280-6133
*eturnbull@hollandlawfirm.com*

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

December 14, 2020

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

15

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2020, I electronically filed the foregoing brief with the Clerk of the Court of the District Court of Maryland by using the CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

*/s/ Emanwel Turnbull*
Emanwel Turnbull