# IN UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ERIC CALL et al., | : | |
| | : | |
| *Plaintiffs*, | : | No. 1:20-cv-3304-DKC |
| | : | |
| v. | : | |
| | : | |
| WOODROW JONES III et al., | : | |
| | : | |
| | : | |
| *Defendants*. | : | |
| | : | |
| | : | |

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO

# DISMISS THE COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................1

STATEMENT ..............................................................................................................2

I.      Maryland's Regulatory Scheme Bans Carry by Typical, Law-Abiding Adults ................2

II.     Defendant's Refusal to Issue Handgun Carry Permits to Plaintiffs.....................................5

ARGUMENT ..............................................................................................................6

I.      The Conduct Restricted by Maryland's Regulatory Scheme Lies at the Core of the Second Amendment. ..........................................................................................6

      A.    Text, Precedent, Purpose, and History All Confirm That the Right to Keep and Bear Arms Extends Outside the Home. ..........................................................6

      B.    *Woollard* Erred in Concluding That the Right to Carry Firearms Outside the Home Is Not at the Core of the Second Amendment.............................................16

II.    Under *Heller*, Defendants' Requirement of a Special Need for Self-defense to Exercise Second Amendment Rights Is Categorically Unconstitutional..........................19

III.   *Woollard* Was Wrong to Uphold Defendants' "Good and Substantial Reason" Restriction Under Intermediate Scrutiny. .........................................................22

      A.    Strict Scrutiny Should Apply. ..............................................................22

      B.    Defendants' "Good and Substantial Reason" Restriction Fails Even Intermediate Scrutiny, Properly Applied. ............................................................22

CONCLUSION...........................................................................................................33

i

**TABLE OF AUTHORITIES**

**Cases**                                                                          **Page**

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) ...................................................10

*Aymette v. State*, 21 Tenn. 154 (1840) ..........................................................17, 18

*Billups v. City of Charleston*, 961 F.3d 673 (4th Cir. 2020) ........................................24

*Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822)..............................................12, 18

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ......................................24, 25

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014)..........................................21

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) ....................................................8

*Carcaño v. McCrory*, 203 F. Supp. 3d 615 (M.D.N.C. 2016) .......................................6

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002)..............................23

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)...................................23

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..............................................1, 2, 6, 7, 8, 10, 12, 16, 18, 19, 20, 21

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) .............................................................24

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857)..............................................15

*Emp. Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990)...................21

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)......................................21

*Gamble v. United States*, 139 S. Ct. 1960 (2019) .......................................................15

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) ..........................................................8

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016) ..............22, 23, 24

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015)...................................23

*Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) ..................................18

*Lucero v. Early*, 873 F.3d 466 (4th Cir. 2017) ...........................................................6

*McCullen v. Coakley*, 573 U.S. 464 (2014) ........................................................24, 25

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)................................9, 16, 20, 22

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)................................7, 8, 9, 19, 25, 26

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ...............................................21

*Nunn v. State*, 1 Ga. 243 (1846)..............................................................8, 12, 18

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)...................................10

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) ...........................11, 12

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)............................................................10

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) .................................22

*Scherr v. Handgun Permit Rev. Bd.*, 880 A.2d 1137 (Md. Ct. Spec. App. 2005) ................2, 4, 20

*Simpson v. State*, 13 Tenn. 356 (1833) ...........................................................................13

*Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686) .......................................................12

*Snowden v. Handgun Permit Review Bd. of Md. Dep't of Pub. Safety and Corr. Servs.*,
    413 A.2d 295 (Md. Ct. Spec. App. 1980) ...................................................................4

*State v. Chandler*, 5 La. Ann. 489 (1850) ...................................................................17, 18

*State v. Huntly*, 25 N.C. 418 (1843) ...............................................................................13

*State v. Reid*, 1 Ala. 612 (1840) ...............................................................................12, 18

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ......................................................27

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ...............................................7, 20

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) ....................................16, 17, 18

*United States v. Virginia*, 518 U.S. 515 (1996) ...............................................................25

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ...................................8, 32

*Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193 (4th Cir. 2017)...............................6

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) .....................................2, 8, 17, 20, 23, 27

*Wrenn v. District of Columbia*,
    864 F.3d 650 (D.C. Cir. 2017) ...............................................8, 13, 14, 16, 17, 18, 19, 21, 22, 23

## **Constitution and Statutes**

U.S. Const. amend. II ...................................................................................... 1, 7

18 U.S.C.

    § 921(a)(20) ...............................................................................................3
    § 922(g)(1) ................................................................................................3
    § 924(a)(2) ................................................................................................3

Md. Code Ann., Pub. Safety

    § 5-133(b)(1) .............................................................................................3
    § 5-205(b)(1) .............................................................................................3
    § 5-303 .....................................................................................................3
    § 5-305 .....................................................................................................3
    § 5-306(a) ...........................................................................................1, 3, 4, 5
    § 5-306(a)(5) ...........................................................................................3, 4
    § 5-306(a)(6)(i) ..........................................................................................3
    § 5-306(a)(6)(ii) .........................................................................................4

Md. Code Ann., Crim. Law

    § 4-202 (West) ...........................................................................................25
    § 4-203(a)(1) ...........................................................................................2, 3
    § 4-203(a)(1)(i) .......................................................................................2, 3

§ 4-203(b)(1) ..................................................................................................3

§ 4-203(c) ...............................................................................................1, 21

1836 Mass. Laws 748, ch. 134, § 16 ...........................................................13

Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832) ....................................15

An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1,
   1865 Miss. Laws 165 .............................................................................15, 16

## Other Authorities

1 *The Works of Thomas Jefferson* (letter of Aug. 19, 1785)
   (H. A. Washington ed., 1884) ....................................................................11

1 Walter L. Fleming, *Documentary History of Reconstruction* (1906) .........16

1 William Hawkins, *A Treatise of the Pleas of the Crown* (1716) ..........10, 12

2 Edw. 3, 258, c. 3 (1328) ............................................................................12

3 James Wilson, *The Works of the Honourable James Wilson* (1804) ......12, 13

4 William Blackstone, *Commentaries* ...............................................9, 10, 12, 14

5 William Blackstone, *Commentaries* App. n.B, (St. George Tucker ed., 1803) ..........11

5 William Blackstone, *Commentaries* App. n.D, (St. George Tucker ed., 1803) ..........11

Abhay Aneja et al., *The Impact of Right to Carry Laws and the NRC Report:*
   *The Latest Lessons for the Empirical Evaluation of Law and Policy*
   (Nat'l Bureau of Econ. Rsch., Working Paper No. 23510, 2012), https://bit.ly/2WfSZhY ....30

Cassandra Crifasi et al., *Association Between Firearm Laws and Homicide in Urban*
   *Counties*, 95 J. Urb. Health 773 (2018) ...................................................31

Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822) ......13

Cong. Globe, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy) ...........16

Daniel W. Webster & Garen J. Wintemute, *Effects of Policies Designed to Keep Firearms*
   *from High-Risk Individuals*, 36 Ann. Rev. Pub. Health 21 (2015),
   https://bit.ly/2LvXYsQ ..............................................................................30

David B. Mustard, *Comment, in* Evaluating Gun Policy
   (Jens Ludwig & Philip J. Cook eds., 2003) ...............................................26

FBI, *Active Shooter Incidents in the United States in 2016 and 2017* (Apr. 2018),
   https://www.fbi.gov/file-repository/active-shooter-incidents-us-2016-2017.pdf/view ..........33

FBI, *Crime Data Explorer*, https://bit.ly/2KtXmn4 .........................................9

*Firearms*, Monticello, https://bit.ly/2LtjazF ...................................................11

Gary Kleck, The Effect of Right-to-Carry Laws on Crime Rates:
   A Critique of the Donohue et al. (2018) Analysis (Sept. 8, 2018)
   (unpublished manuscript), https://bit.ly/3mqMrYC ........................28, 29, 30, 31

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Crim'gy 150 (1995)................................32

Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. Rsch. in Crime & Delinquency 193 (1998)...........................32, 33

*Guide to the Interstate Transportation of Firearms, Gun Laws*, NRA-ILA, https://bit.ly/3ak1G3n ...............................................................................26

Harlow Giles Unger, *Lion of Liberty* 30 (2010) .............................................................11

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770, in* 6 Masterpieces of Eloquence 2569 (Hazeltine et al. eds., 1905).........................................11

John Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Stud. 198 (2019) ....................................................28, 29, 30

John R. Lott, Concealed Carry Permit Holders Across the United States: 2018 34 (Aug. 29, 2018) (unpublished manuscript), https://bit.ly/37DwJ8e .........................26

*Legality of the London Military Foot-Association* (1780), *reprinted in* William Blizzard, *Desultory Reflections on Police* (1785). ...............................................10

Mark E. Hamill et al., *State Level Firearm Concealed-Carry Legislation & Rates of Homicide & Other Violent Crime*, J. Am. C. Surgeons (2019) ...............................31

Mark Gius, *Using the Synthetic Control Method to Determine the Effects of Concealed Carry Laws on State-Level Murder Rates*, 57 Int'l Rev. L. & Econ. 1 (2019).......................31

Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 Am. J. Pub. Health 1923 (2017), https://bit.ly/3r1r57R ........31

National Research Council, *Firearms and Violence: A Critical Review* (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005)........................26, 27, 32

Nicholas J. Johnson & David B. Kopel et al., *Firearms Law and the Second Amendment* (2012)................................................................................10

Philip J. Cook et al., *Gun Control After Heller*, 56 UCLA L. Rev. 1041 (2009) .........................26

Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 Am. J. Preventative Med. 40 (2005) .................................................27

Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Geo. L.J. 309 (1991)...................................15, 16

Robert Leider, Constitutional Liquidation, Surety Laws, and the Right to Bear Arms (Nov. 4, 2020) (unpublished manuscript), https://bit.ly/3oVfdlU ...................................13, 14

Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms,"* 49 Law & Contemp. Probs. 151 (1986) ...........................................32

William Lambard, *Eirenarcha* 135 (1588) ........................................................12

William M. Darlington, *Christopher Gist's Journals* (1893).........................................11

## INTRODUCTION

At the core of the Second Amendment lies "the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). When the people elevated that right into the Nation's fundamental charter, they did not intend to leave the freedom to exercise it at the mercy of the very government officials whose hands they sought to bind. No, "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634.

The State of Maryland has imposed limits on "the right of the people to . . . bear Arms," U.S. Const. amend. II, that flout these basic constitutional principles at every turn by criminalizing the carrying of handguns by ordinary citizens, making it wholly unlawful for law-abiding citizens to exercise their fundamental right to bear arms in public for self-defense without first satisfying the State that they have a "good and substantial reason" to do so. Md. Code Ann., Pub. Safety § 5-306(a)(6)(ii); Md. Code Ann., Crim. Law § 4-203(c). The only exception to the State's criminal laws, a valid permit to wear, carry, or transport the handgun issued under Title 5, Subtitle 3 of the Public Safety Article, is unavailable to typical law-abiding adults because Maryland has seized the very power forbidden it by the Second Amendment: the power to decide, on a case-by-case basis, whether an applicant for a permit to "carry weapons in case of confrontation," *Heller*, 554 U.S. at 592. In the estimation of Maryland's licensing authorities, carry permit applicants' right to self-defense does not provide a sufficiently "good and substantial reason" to exercise that right, Md. Code Ann., Pub. Safety § 5-306(a)(6)(ii)—demanding, instead, *documented evidence* of *concrete threats* or *recent assaults*, that set the applicant apart from the "average citizen." Md. State Police Standard Operating Proc., SOP 29-19-004 ("SOP") at 6, 2 (Feb. 26, 2020),

https://mdsp.maryland.gov/Organization/Licensing%20Division%20Documents/S.O.P.%2029-19-004%20-%20Processing%20of%20Handgun%20Permit%20Applications.pdf (attached hereto as Exhibit 1); *see also Scherr v. Handgun Permit Rev. Bd.*, 880 A.2d 1137, 1148 (Md. Ct. Spec. App. 2005). Maryland has thus struck a balance *directly contrary* to the Constitution's demand that the right to self-defense—"the *central component*" of the Second Amendment, *Heller*, 554 U.S. at 599—must be "elevate[d] above all other interests." *Id.* at 635.

To be sure, as Maryland points out, the Fourth Circuit—in precedent we concede is binding on this Court at this stage in the litigation—has upheld Maryland's "good and substantial reason" limit. *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013). But *Woollard* is deeply flawed, and it should be overturned at the first opportunity by a court competent to do so. *Woollard* does not meaningfully acknowledge the State's regulatory scheme as a de facto ban on the carry of firearms, nor does it properly consider the extensive textual and historical evidence demonstrating that the right to carry firearms for self-protection outside the home is at the very core of the Second Amendment. It adopts merely what it deems to be "intermediate" constitutional scrutiny, effectively relegating the right to bear arms to second-class status. And even if the choice of intermediate scrutiny were defensible, *Woollard*'s application of it—essentially deferring to the State's judgment without discussing or even *identifying* the empirical evidence on which that judgment was supposedly based—is not.

In sum, although this Court is presently bound by Fourth Circuit precedent to uphold it, Maryland's regulatory scheme, including its "good and substantial reason" restriction is unconstitutional.

## STATEMENT

## I.    Maryland's Regulatory Scheme Bans Carry by Typical, Law-Abiding Adults

In the State of Maryland, an ordinary, law-abiding citizen may not "wear, carry, or

transport a handgun, whether concealed or open, on or about the person." Crim. § 4-203(a)(1)(i). A person who violates this provision commits a misdemeanor offense and is subject to severe criminal sanctions, including imprisonment for up to three years for the first offense. *Id.* § 4-203(c)(1)–(2). These provisions do not apply "to a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article." *Id.* § 4-203(b)(1)–(2). Under federal law, 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 921(a)(20), any conviction under these provisions would result in a lifetime federal firearms disability. Knowing violation of this disability, including by possession affecting interstate commerce of a firearm, is punishable by up to ten years' imprisonment under federal law. 18 U.S.C. § 924(a)(2). The same lifetime disability and similar penalties are imposed under Maryland law. *See* Pub. Safety §§ 5-101(g)(3), 5-133(b)(1), 5-205(b)(1).

Thus, because of the Defendants' active enforcement of the State's laws and policies, an ordinary member of the general public who wishes to "wear, carry, or transport a handgun" in public, "whether concealed or open," must first obtain a permit to do so (a "Handgun Carry Permit") from the Maryland Secretary of State Police, Defendant Jones. Md. Code Ann., Crim. Law § 4-203(a)(1), (b)(2); *see also* Pub. Safety § 5-303. Maryland imposes numerous objective restrictions on the eligibility for a Handgun Carry Permit. For example, an applicant must be an adult, must not have been convicted of any felony or any misdemeanor involving controlled substances, and must not be an alcoholic or addicted to any controlled substance. Pub. Safety § 5-306(a). An applicant must also pass a background check, *id.* § 5-305, must satisfy the Secretary, after investigation, that the applicant "has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another," *id.* § 5-306(a)(6)(i), and must have completed an extensive firearms safety training course, *id.* § 5-

306(a)(5).

In addition to these eligibility requirements, Maryland law also imposes an entirely subjective restriction on the availability of Handgun Carry Permits: an applicant must demonstrate that he or she "has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger." *Id.* § 5-306(a)(6)(ii). Under regulations maintained by Defendant Jones and enforced by both him and Defendant Frosh, the apprehended fear must be "beyond that of the average citizen that he/she is being targeted by individuals wishing to cause him/her harm." SOP at 2. Accordingly, "vague threat[s]" are *not* sufficient "good and substantial reasons" to obtain a permit, and it is not acceptable that "[e]ach person *could decide for himself or herself* that he or she was in danger." *See Snowden v. Handgun Permit Review Bd. of Md. Dep't of Pub. Safety and Corr. Servs.*, 413 A.2d 295, 298 (Md. Ct. Spec. App. 1980) (emphasis added) (cited at *Handgun Wear and Carry Permit*, Md. State Police, https://mdsp.maryland.gov/Organization/Pages/-CriminalInvestigationBureau/LicensingDivision/Firearms/WearandCarryPermit.aspx?View=%7Bd916bb38-9fb0-4be4-83fb-647a71f71634%7D&SortField=Doc_x0020_Title&SortDir=Desc (last visited Dec. 20, 2020)). Instead, an applicant must generally face a concrete risk that sets him or her apart from "an average person" who "lives in a dangerous society" and wants to carry a protective firearm for that reason. *See Scherr*, 880 A.2d at 1148 (cited at *Handgun Wear and Carry Permit*).

Further, under Defendants' regulations, even a person who faces an imminent, atypical threat must still prove that threat by providing "[c]opies of *documented evidence* that the applicant's life is in imminent danger or is currently being targeted by individuals wishing to do the applicant harm." SOP at 6 (emphasis added). In particular, "[t]here must be documented

evidence of recent threats, robberies, and/or assaults, supported by official police reports or notarized statements from witnesses." Application Information, Md. State Police Licensing Portal, *accessed at* https://licensingportal.mdsp.maryland.gov/MSPBridgeClient/#/home (attached as Exhibit A to the Declaration of Tiernan B. Kane ("Kane Decl.") (attached hereto as Exhibit 2)); *accord* Instructions for Handgun Permit in the Licensing Portal, Md. State Police Licensing Portal, *accessed at* https://licensingportal.mdsp.maryland.gov/MSPBridgeClient-/#/home (attached as Exhibit B to Kane Decl.); *see also* Compl. for Declaratory and Injunctive Relief, Doc. No. 1 at ¶ 3 (Nov. 13, 2020) ("Complaint").

Consequently, typical Maryland citizens—who cannot provide "documented evidence of recent threats," *id.*, that set them apart from the "average citizen," SOP at 2, and who amount to the vast majority of citizens—are subject to an effective ban on carrying handguns outside the home for self-defense.

## II.   Defendant's Refusal to Issue Handgun Carry Permits to Plaintiffs

Defendants concede that "Plaintiffs Call, Mehl and Harrison applied for and were denied a permit on the basis that they did not have a 'good and substantial reason' to wear, carry or transport a handgun,"[1] and that Plaintiffs Firearms Policy Coalition, Inc., Second Amendment Foundation, Maryland Shall Issue, Inc., and Citizens Committee for the Right to Keep and Bear Arms "have members who intend and desire to keep and bear arms outside the home." Defs.' Mem in Supp. of Mot. to Dismiss the Compl. at 3, Doc. No. 16-1 (Dec. 7, 2020) ("MTD Mem."). Each

---

[1] Mr. Call applied to Defendant Jones for a permit to carry a handgun in public before October 2020 and was denied by Defendant Jones on October 15, 2020, even though he possesses all of the qualifications to obtain a Handgun Carry Permit enumerated in section 5-306(a)(1)–(5) of the Public Safety Article of the Maryland Code. Complaint ¶¶ 20, 23, 22. Likewise, Mr. Mehl applied to Defendant Jones for a permit in or around March 2020, but was denied on or about July 11, 2020, even though he qualified for a permit under section 5-306(a)(1)–(5). *Id.* at ¶ 25, 28, 27. Finally, Mr. Harrison applied to Defendant Jones for a permit, but was denied on or about October 1, 2020, despite being qualified under section 5-306(a)(1)–(5). *Id.* at ¶ 30, 33, 32.

of the organizational plaintiffs has had at least one member denied a Handgun Carry Permit for alleged lack of a "good and substantial reason." *See* Complaint at ¶¶ 1–3.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Lucero v. Early*, 873 F.3d 466, 469 (4th Cir. 2017) (quotation marks omitted). The Court must "accept as true all well-pleaded facts in a complaint and construe them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).

As Defendants note, the Fourth Circuit held in *Woollard* that Maryland's "good and substantial reason" restriction on the issuance of Handgun Carry Permits is consistent with the Second Amendment. Because this Court is "bound to follow circuit precedent," *Carcaño v. McCrory*, 203 F. Supp. 3d 615, 637 (M.D.N.C. 2016), Plaintiffs do not dispute that it must follow the controlling decision in *Woollard*, with respect to the "good and substantial reason" restriction at this point in the proceedings. But *Woollard*'s ruling is deeply flawed, and as we show below, it should be overruled at the first opportunity by a court with authority to do so.

## I.    The Conduct Restricted by Maryland's Regulatory Scheme Lies at the Core of the Second Amendment.

### A.    Text, Precedent, Purpose, and History All Confirm That the Right to Keep and Bear Arms Extends Outside the Home.

In *Heller*, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592. And although that landmark ruling did not purport to "clarify the entire field" of Second Amendment jurisprudence, *id.* at 635, *Heller* did set forth clear guidance about *the methodology* for deciding future disputes over the right to keep and bear arms. Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *id.* at 634–35, deciding whether a

government restriction challenged on Second Amendment grounds can be squared with that provision involves close "textual analysis" and "historical inquiry." *United States v. Chester*, 628 F.3d 673, 675, 680 (4th Cir. 2010). Here, text, precedent, purpose, and history uniformly show that the carrying of firearms outside the home for self-defense is squarely protected by the Second Amendment right.

1.      The text of the Second Amendment leaves no doubt that it applies outside the home. The substance of the Second Amendment right reposes in the twin verbs of the operative clause: "the right of the people to keep *and bear* Arms, shall not be infringed." U.S. Const. amend. II (emphasis added). Because "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage," the Constitution's explicit inclusion of the "right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). Indeed, interpreting the Second Amendment as confined to the home would read the second of these guarantees—the right to bear arms—out of the Constitution's text altogether, for the right to keep arms, standing alone, would be sufficient to protect the right to have arms in the home.

2.      Confining the Second Amendment to the home would also be at war with precedent. The Supreme Court's decision in "*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home." *Id.* at 935–36. For instance, *Heller* squarely holds that the Second Amendment "guarantee[s] the individual right to possess *and carry* weapons in case of confrontation," 554 U.S. at 592 (emphasis added), and it defines the key constitutional phrase "bear arms" as to " 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person,' " *id.* at 584 (alterations in original) (quoting *Muscarello v.*

*United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). *Heller*'s indication that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively lawful" also implicitly recognizes a general right to bear arms in public; otherwise, there would be no need to identify exceptions. *Id.* at 626, 627 n.26. Moreover, *Heller* extensively cites and significantly relies upon *Nunn v. State*, a nineteenth-century Georgia case that "struck down a ban on carrying pistols openly" under the Second Amendment. *Id.* at 612; *see also Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (vacating state court ruling that the Second Amendment does not protect the right to carry a stun gun in public).

While the Fourth Circuit has not squarely addressed whether the Second Amendment applies outside the home, *Woollard* "assume[d] that the *Heller* right exists outside the home." 712 F.3d at 876. That assumption is consistent with the persuasive authority from other federal courts. Three circuit courts have directly held that the Second Amendment right to armed self-defense does not give out at the doorstep. *See Gould v. Morgan*, 907 F.3d 659, 670 (1st Cir. 2018) ("we view *Heller* as implying that the right to carry a firearm for self-defense guaranteed by the Second Amendment is not limited to the home"); *Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017); *Moore*, 702 F.3d at 935, 942. And *no* federal court of appeals has held that the Amendment *does not* apply outside the home.

3.    The very purposes behind the Second Amendment's codification show that it must protect the carrying of arms outside the home. As announced by its "prefatory" clause, the Amendment was designed in part "to prevent elimination of the militia." *Heller*, 554 U.S. at 599. A right to bear arms limited to the home would be ill-suited to "rearing up and qualifying a well-regulated militia," *id.* at 612 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)), for if citizens could be prohibited from carrying arms in public, they simply could not act as the militia at all.

Of course, the militia was not "the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Id.* at 599. Hunting obviously cannot be conducted by those bearing arms only within their homes. And the same reasoning applies with even more force to the "the *central component*" of the Second Amendment right: self-defense. *Id.* There is nothing in *Heller*'s language to suggest that this core purpose may only be pursued in the home. Nor is there any such suggestion in the Amendment's text. And "one doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home." *Moore*, 702 F.3d at 936. "The Supreme Court has decided that the [Second Amendment] confers a right to bear arms for self-defense, which is as important outside the home as inside." *Id.* at 942. Indeed, according to nationwide data from the Federal Bureau of Investigation, in 2019, almost half of all robberies, for example, occurred on the street or in a parking lot or garage. FBI, *Crime Data Explorer*, https://bit.ly/2KtXmn4; *see also Moore*, 702 F.3d at 937 ("[A] Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower.") Thus, "[t]o confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*." *Moore*, 702 F.3d at 937.

4.      Finally, the historical understanding of the right to keep and bear arms conclusively confirms that it extends outside the home.

As *McDonald v. City of Chicago* explains, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." 561 U.S. 742, 767 (2010). And because the need for self-defense may *arise* in public, it has long been recognized that the right to self-defense may be *exercised* in public. Thus, "[i]f any person attempts a robbery or murder of another,

*or* attempts to break open a house in the night time, . . . and shall be killed in such attempt, the slayer shall be acquitted and discharged." 4 William Blackstone, *Commentaries* *180 (emphasis added). "Sergeant William Hawkins's widely read Treatise of the Pleas of the Crown," *Atwater v. City of Lago Vista*, 532 U.S. 318, 331 (2001), likewise explained that "the killing of a Wrong-doer . . . may be justified . . . where a Man kills one who assaults him in the Highway to rob or murder him," 1 William Hawkins, *A Treatise of the Pleas of the Crown* 108 (1716).

Because the right to self-defense was understood to extend beyond the home, the right to *armed* self-defense naturally was as well. Accordingly, by the late seventeenth century the English courts recognized that it was the practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686). A century later, the Recorder of London— a judge and "the foremost legal advisor to the city," *Parker v. District of Columbia*, 478 F.3d 370, 382 n.8 (D.C. Cir. 2007)—opined that "the right of his majesty's Protestant subjects, to have arms for their own defence, and to use them for lawful purposes, is most clear and undeniable," *Legality of the London Military Foot-Association* (1780), *reprinted in* William Blizzard, *Desultory Reflections on Police* 59 (1785). These "lawful purposes, for which arms may be used," were not limited to the home, for they included "immediate self-defence, . . . suppression of violent and felonious breaches of the peace, the assistance of the civil magistrate in the execution of the laws, and the defence of the kingdom against foreign invaders." *Id*. at 63.

That understanding was shared on this side of the Atlantic. Indeed, "about half the colonies had laws *requiring* arms-carrying in certain circumstances," such as when traveling. Nicholas J. Johnson & David B. Kopel et al., *Firearms Law and the Second Amendment* 106–08 (2012) (emphasis added). Plainly, if the law imposed on individuals a duty to bear arms "for public-safety reasons," *Heller*, 554 U.S. at 601, it necessarily conferred a corresponding right to do so. And that

understanding endured in the next century, both before and after the Revolution. Indeed, as Judge St. George Tucker observed in 1803, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 William Blackstone, *Commentaries* App. n.B, at 19 (St. George Tucker ed., 1803). And Tucker made clear that Congress would exceed its authority were it to "pass a law prohibiting any person from bearing arms." 1 *id.* App. n.D, at 289.

The practices of the Founding generation confirm that the right to carry arms was well-established. George Washington, for example, carried a firearm on an expedition into the Ohio Country. William M. Darlington, *Christopher Gist's Journals* 85–86 (1893). Thomas Jefferson advised his nephew to "[l]et your gun . . . be the constant companion of your walks," 1 *The Works of Thomas Jefferson* 398 (letter of Aug. 19, 1785) (H. A. Washington ed., 1884), and Jefferson himself traveled with pistols for self-protection and designed a holster to allow for their ready retrieval, *see Firearms*, Monticello, https://bit.ly/2LtjazF. Even in defending the British soldiers charged in the Boston Massacre, John Adams conceded that, in this country, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants [of Boston] had a right to arm themselves at that time for their defence." John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 Masterpieces of Eloquence 2569, 2578 (Hazeltine et al. eds., 1905). And as an attorney, Patrick Henry regularly carried a firearm while walking from his home to the courthouse. Harlow Giles Unger, *Lion of Liberty* 30 (2010).

This understanding was also reflected in contemporary judicial decisions. As the panel decision in *Peruta v. County of San Diego* concluded after an exhaustive survey of the early-American case law, although "some courts approved limitations on the manner of carry outside

the home, none approved a total destruction of the right to carry in public." 742 F.3d 1144, 1160 (9th Cir. 2014), *vacated*, 781 F.3d 1106 (9th Cir. 2015) (en banc); *see also, e.g.*, *Nunn*, 1 Ga. at 243, 249–51; *State v. Reid*, 1 Ala. 612, 616–17 (1840); *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 91–93 (1822).

To be sure, the right to bear arms is not a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. For example, in the pre-history of the Second Amendment, the medieval Statute of Northampton provided that "no man great nor small" shall "go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere." 2 Edw. 3, 258, c. 3 (1328). But Northampton—and the analogues adopted on this side of the Atlantic—did not broadly prohibit public carry in populated places. To the contrary, by the seventeenth century the courts and commentators had conclusively interpreted the provision as limited to "prohibiting the carrying of 'dangerous and unusual weapons,' " *Heller*, 554 U.S. at 627—weapons not protected by the right to keep and bear arms, *id.* at 623–24, 627—or otherwise "go[ing] armed to terrify the King's subjects," *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). And this rule against "*riding or going armed*, with dangerous or unusual weapons" and thereby "terrifying the good people of the land," 4 William Blackstone, *Commentaries* *148–49, was not understood as extending to the ordinary carrying of weapons "usually worne and borne," William Lambard, *Eirenarcha* 135 (1588), unless "accompanied with such circumstances as are apt to terrify the people," 1 Hawkins, *supra*, at 136.

Early American courts and commentators shared this understanding of the scope of the right to bear arms in self-defense. For instance, James Wilson, a leading Framer and Supreme Court Justice, explained in his widely read Lectures on Law that it was unlawful only to carry

"dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 James Wilson, *The Works of the Honourable James Wilson* 79 (1804). After all, as another commentator explained, "in this country the constitution guaranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily." Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822); *see also State v. Huntly*, 25 N.C. 418, 422–23 (1843); *Simpson v. State*, 13 Tenn. 356, 359–60 (1833).

And early American understanding was manifested in early American practice. A new historical study of arrest reports, across the United States, throughout the entire nineteenth century, revealed almost no arrests for Northampton violations. Robert Leider, Constitutional Liquidation, Surety Laws, and the Right to Bear Arms (Nov. 4, 2020) (unpublished manuscript), https://bit.ly/3oVfdlU. Such data fits with a ban on "terrify[ing] the people unnecessarily," but not at all with a general ban on carriage of arms.

Further still from such a general ban were "surety"-type laws enacted beginning in the 1830s. These laws required any person who bore arms in public to post a deposit or "surety" "for keeping the peace" upon complaint of "any person having reasonable cause to fear an injury, or breach of the peace," unless he himself could show that he had "reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property." 1836 Mass. Laws 748, 750, ch. 134, § 16. To be clear, these laws were triggered only when some person who reasonably felt threatened lodged a complaint. 1836 Mass. Laws 750. Moreover, even if there was a complaint, the individual in question could nonetheless *continue to carry his firearm*, so long as he posted a surety designed to cover the potential costs of any breach of the peace. *Id.* These laws were also accompanied by a safe-harbor provision for anyone carrying a firearm because of "reasonable

cause to fear an assault or other injury" to himself, his family, or his property. Taken together, these surety-style laws simply "did not deny a responsible person carrying rights unless he showed a special need for self-defense." *Wrenn*, 864 F.3d at 661.

Furthermore, the historical evidence makes clear that these types of restrictions were not viewed as broadly restricting public carry. As Blackstone explained, a law requiring the posting of a surety to keep the peace was "intended merely for prevention" in circumstances where there was "a probable suspicion, that some crime is intended or likely to happen; and consequently *it is not meant as any degree of punishment*, unless perhaps for a man's imprudence in giving just ground of apprehension." 4 William Blackstone, *Commentaries* *249 (emphasis added).

Accordingly, when the leading surety-law state, Massachusetts, wanted actually to prohibit and punish various modes of carriage of arms, it turned to passing a series of criminal statutes. *See* Leider, *supra*, at 13. When one of these statutes was challenged in court, the Massachusetts Supreme Judicial Court supported the restriction's constitutionality by turning to examples from the South and from Indiana. *Id.* at 13–14. The Court "omit[ted] any mention of the 1835 surety statute," which would surely have been cited for a sixty-year history of banning the public carriage—if in fact there had been such a history. *Id.* at 14. Instead, the historical evidence reveals a common understanding that carrying concealed weapons in Massachusetts was lawful through the nineteenth century. *Id.* During that time, there were, across all the surety-law states, only three court cases "involving sureties or bonds for the peaceful carrying of firearms." *Id.* at 17. One of those cases was dropped on appeal, all of them involved the arrest of African Americans in a period plagued by racial discrimination, and none of them suggests that surety-style laws were broad bans on public carriage of firearms. *See id.* at 16–17. Rather, "surety" laws suggest how well respected the right to carry was: Not only was carrying not prohibited; it was not even *restricted*—even in

14

name—except in instances of special threats.

And indeed, as this example suggests, the understanding that the Second Amendment protected a robust right to carry firearms outside the home persisted throughout the nineteenth century. While the dispositive question on the scope of the Second Amendment is "the public understanding in 1791," Reconstruction-era views provide "confirmation of what . . . ha[s] already been established"—the right to bear arms protects the carrying of firearms outside the home for self-defense. *See Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019).

At least, that was true for those whose rights were respected. For decades before the Civil War, the southern States schemed at every turn to prevent their enslaved and free black populations from enjoying their freedom, including their freedom to bear arms. An 1832 Delaware law, for example, forbade any "free negroes [or] free mulattoes to have own keep or possess any Gun [or] Pistol," unless they first received a permit from "the Justice of the Peace" certifying "that the circumstances of his case justify his keeping and using a gun." Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832); *see also* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Geo. L.J. 309, 336–38 (1991) (citing similar laws in Texas, Mississippi, Louisiana, South Carolina, Maryland, Virginia, and Georgia). Indeed, Chief Justice Taney recoiled so strongly from recognizing African Americans as citizens in the infamous *Dred Scott* case precisely because he understood that doing so would entitle them "to keep and carry arms wherever they went." *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 417 (1857).

After the Civil War, these noxious efforts to suppress the rights of former slaves to carry arms for self-defense continued. Mississippi's notorious "Black Code," for example, forbade any "freedman, free negro or mulatto" to "keep or carry fire-arms of any kind." An Act To Punish

Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165. Parallel restrictions were enacted in Louisiana and Alabama. Cottrol & Diamond, *supra*, at 344–45. And in an ordinance strikingly similar in operation to Maryland's "good and substantial reason" law, several Louisiana towns provided that no freedman "shall be allowed to carry fire-arms, or any kind of weapons, within the parish" without the approval of "the nearest and most convenient chief of patrol." 1 Walter L. Fleming, *Documentary History of Reconstruction* 279–80 (1906). As the Supreme Court explained at length in *McDonald*, the Reconstruction Congress labored mightily to entomb this legacy of prejudice. *See* 561 U.S. at 770–77. Congress's efforts culminated in the adoption of the Fourteenth Amendment, which ensured the right of every American, regardless of race, to "bear arms for the defense of himself and family and his homestead." Cong. Globe, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy); *see also McDonald*, 561 U.S. at 775–76.

      **B.**     ***Woollard* Erred in Concluding That the Right to Carry Firearms Outside the Home is Not at the Core of the Second Amendment.**

The right to "carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, is not only within the scope of the Second Amendment; it lies at the very core of that guarantee. *Heller* makes clear that the right to individual self-defense is "the *central component*" of the Second Amendment. *Id.* at 599. Given that the Second Amendment's text, history, and purposes all show that its protections extend outside the home, the right to carry firearms "for the core lawful purpose of self-defense" necessarily extends beyond those four walls as well. *Id.* at 630. "Thus, the Amendment's core generally covers carrying in public for self-defense." *Wrenn*, 864 F.3d at 659.

*Woollard* disagreed with this proposition, based on the Fourth Circuit's earlier conclusion in *United States v. Masciandaro* that the Second Amendment right is "more limited" in public than within the home, and that restrictions on carrying arms outside the home are thus subject to only

intermediate scrutiny. 638 F.3d 458, 470–71 (4th Cir. 2011). That reasoning fails for multiple reasons. To start, because both *Masciandaro* and *Woollard* explicitly declined to conduct any meaningful textual and historical analysis of whether the Second Amendment applies outside the home, *id.* at 474 (opinion of Wilkinson, J.), the Fourth Circuit had little basis for concluding that the right to bear arms outside the home falls outside the core of the Second Amendment. While the Fourth Circuit's decision to "assume that the *Heller* right exists outside the home," *Woollard*, 712 F.3d at 876, may have been "meant to be generous to the plaintiffs, by granting a premise in their favor," its effect was to sweep under the rug the overwhelming historical and textual support, discussed above, for the conclusion that the right to bear arms in public lies at the very heart of the Second Amendment, *Wrenn*, 864 F.3d at 663.

Instead of grappling with the historical evidence discussed above, *Masciandaro* merely asserted that "firearm rights have always been more limited" outside the home, based on a series of laws, dating from the nineteenth century and later, that targeted the carrying of *concealed* weapons. 638 F.3d at 470. These laws, according to the Fourth Circuit, evinced a "longstanding out-of-the-home/in-the-home distinction." *Id.* Not so. While these laws limited the carrying of *concealed* firearms—a practice that was considered dishonorable and especially dangerous by the social mores of the day—they did so against the background of *freely allowing* the *open* carrying of arms, thus "le[aving] ample opportunities for bearing arms." *Wrenn*, 864 F.3d at 662.

The fact that these laws left intact the background right to carry firearms in *some* manner was absolutely *critical* to most of the judicial opinions assessing their constitutionality. The distinction was relied upon by courts that upheld this type of law against constitutional challenge. *See State v. Chandler*, 5 La. Ann. 489, 490 (1850) (concealed carry ban "interfered with no man's right to carry arms . . . 'in full open view,' " and thus did not interfere with "the right guaranteed

by the Constitution of the United States"); *Aymette v. State*, 21 Tenn. 154, 160–61 (1840); *State v. Reid*, 1 Ala. 612, 616–17 (1840). And it was also endorsed by the opinions *striking down* limitations on carrying firearms that cut too close to the core. *See Nunn*, 1 Ga. at 251 (limitation on "the practice of carrying certain weapons *secretly*" was "valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms," but "prohibition against bearing arms *openly*" was "in conflict with the Constitution, and *void*"); *see also Bliss*, 12 Ky. at 91–94 (holding that even an "act to prevent persons from wearing concealed arms, is unconstitutional and void," *id.* at 93).[2] These laws thus provide no historical pedigree for restrictions, like Maryland's, which prohibit *both* open and concealed carrying and thus add up to "a denial of the right altogether." *Aymette*, 21 Tenn. at 161.

*Masciandaro* specifically cited the Georgia Supreme Court's decision in *Nunn*, but that case *refutes* the Fourth Circuit's analysis. *Masciandaro* cites *Nunn* for the proposition that

> a law which is merely intended to promote personal security, and to put down lawless aggression and violence, and to this end prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution.

*Masciandaro*, 638 F.3d at 470–71 (quoting *Nunn*, 1 Ga. at 249). What the Fourth Circuit neglects to mention is that *Nunn struck down* the state law at issue in the case, reasoning that because it did not allow citizens to carry firearms *either concealed or openly* it "amount[ed] to a *destruction* of the right." *Nunn*, 1 Ga. 249. Indeed, the Supreme Court in *Heller* expressly noted that *Nunn* "struck down a ban on carrying pistols openly," citing it as an example of how a law that imposes a "severe

---

[2] A few courts from this era upheld concealed carry bans without relying on this distinction, but they did so "on the basis of an interpretation of the Second Amendment . . . that conflicts with [*Heller*.]" *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 91 n.14 (2d Cir. 2012). Those outlier decisions are thus "sapped of authority by *Heller*," and cannot be cited as reliable guides to the Second Amendment's scope. *Wrenn*, 864 F.3d at 658.

restriction" on the right to keep and bear arms should be categorically "struck down." 554 U.S. at 612, 629.

Had the Fourth Circuit in *Woollard* or *Masciandaro* fairly engaged in the textual and historical analysis required by *Heller*, it would have reached the same conclusion as the two circuits that *have* treated seriously the Second Amendment's text and history. *See Wrenn*, 864 F.3d at 661; *Moore*, 702 F.3d at 937, 942. For as shown above, these sources of authority leave no doubt that this constitutional guarantee extends outside the home. *See supra*, Part I.A. And because that is so, the right to *bear* arms "for the core lawful purpose of self-defense," *Heller*, 554 U.S. at 630, can be no further from the heartland of the Second Amendment than the right to *keep* them. *See also Wrenn*, 864 F.3d at 663 ("[T]he rights to keep and bear arms are on equal footing [;] the law must leave responsible, law-abiding citizens some reasonable means of exercising each.").

## II. Under *Heller*, Defendants' Requirement of a Special Need for Self-defense to Exercise Second Amendment Rights Is Categorically Unconstitutional.

Given that the core of the Second Amendment extends to armed self-defense outside the home, *Heller* makes the next analytical steps clear. Because "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon," wholesale infringements on the Amendment's "core protection" must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634. Defendant's prohibition is just such an infringement of core Second Amendment conduct. Accordingly, it is flatly unconstitutional.

In *Heller*, the Supreme Court declined the invitation to analyze the ban on possessing handguns at issue under "an interest-balancing inquiry," such as that "the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases,"

19

554 U.S. at 689–90 (Breyer, J., dissenting). Instead, the Court determined, the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text, *id.* at 635 (majority opinion). Thus, as the Court reaffirmed in *McDonald*, it "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion).

This methodological mandate went wholly unheeded in *Woollard*, however. The Court "appl[ied] . . . means-end scrutiny"—an interest-balancing test—even after assuming that "the *Heller* right . . . has been infringed." 712 F.3d at 875 (quoting *Chester*, 628 F.3d at 680); *id.* at 876. That is, *Woollard* denied the conclusiveness of a determination, by "historical inquiry," that "the conduct at issue was understood to be within the scope of the right at the time of ratification." *Id.* at 875 (quoting *Chester*, 628 F.3d at 680). In thus rejecting *Heller*'s text-and-history approach in favor of a two-step, interest-balancing approach, *Woollard* erred. Applying *Heller*'s method, then, it is dispositive that the restrictions enforced by Defendants *extinguish* the core Second Amendment rights of typical citizens. The threat facing such citizens is, by definition, the general threat of "liv[ing] in a dangerous society," and Maryland has deemed that threat categorically insufficient to justify a Handgun Carry Permit. *See* SOP at 6; *Scherr*, 880 A.2d at 1148. Instead, Defendant Jones requires, and Defendant Frosh reinforces, that Handgun Carry Permit applicants provide "documented evidence of recent threats," Ex. 2 at Ex. A; *see also* SOP at 6, that sets them apart from the "average citizen," SOP at 2.

The Second Amendment does not set up a race between law-abiding citizens and their assailants to the license bureau. For those whose life or safety is threatened, it is cold comfort to know that they could have carried a firearm *if only they could have documented their "apprehended danger" in advance*. Yet, without a permit, any carrying of a handgun outside the

home for self-defense purposes, including situations involving "apprehended danger," is criminalized by section 4-203(a) of the Criminal Law Article of the Maryland Code, and thus could land the citizen in jail for up to three years, no matter how immediate or severe the danger, § 4-203(c)(1)–(2)(i). Surely under the Second Amendment—which protects the right to bear arms "*in case* of confrontation," *Heller*, 554 U.S. at 592 (emphasis added)—that scheme turns the right to bear arms on its head.

Indeed, the State's demand that a citizen prove to its satisfaction that he has a good enough reason to carry a handgun is flatly inconsistent with the very nature of the Second Amendment right. The existence of that right is itself reason enough for its exercise. It is thus no surprise that courts have rejected this kind of "ask-permission-first" regime across a wide variety of constitutional rights, reasoning that the government has failed to honor a right if it demands to know—and assess *de novo*—the reasons justifying each occasion of its exercise. *See, e.g.*, *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784 (1978) (government cannot condition speech on "a requirement that the speaker have a sufficiently great interest in the subject to justify communication"); *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (prior restraint presumptively unconstitutional); *Emp. Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990) (government cannot "question the centrality" or "plausibility" of religious convictions); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014).

In short, as the D.C. Circuit persuasively concluded, a proper-cause-type requirement that limits the carrying of firearms outside the home to those with a "heightened need" for self-defense "is necessarily a total ban on most . . . residents' right to carry a gun in the face of ordinary self-defense needs." *Wrenn*, 864 F.3d at 666. Indeed, such a restriction "destroys the ordinarily situated citizen's right to bear arms not as a side effect of applying other, reasonable regulations . . . , but

by design: it looks precisely for needs 'distinguishable' from those of the community." *Id.* Such a prohibition is unconstitutional *per se*.

## III. *Woollard* Was Wrong to Uphold Defendants' "Good and Substantial Reason" Restriction Under Intermediate Scrutiny.

### A. Strict Scrutiny Should Apply.

Even if Defendants' restrictions were not *categorically* unconstitutional, they should at the least be subjected to the highest level of constitutional scrutiny. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778. *Woollard*'s application of merely intermediate scrutiny, by contrast, relegates the Second Amendment to "a second-class right." *Id.* at 780 (plurality).

### B. Defendants' "Good and Substantial Reason" Restriction Fails Even Intermediate Scrutiny, Properly Applied.

In this case, though, the standard of heightened scrutiny is immaterial, for the "good and substantial reason" restriction fails even under intermediate scrutiny.

1. That is so, first, as a matter of law. By design, Defendants' restrictions are to reduce firearm violence *only by reducing the quantity of firearms in public*. That is "not a permissible strategy"—even if used as a means to the further end of increasing public safety. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016), *aff'd sub nom. Wrenn v. District of Columbia*, 864 F.3d 650. That conclusion follows directly from the Supreme Court's precedents in the secondary-effects area of free-speech doctrine.

The Supreme Court has held that governmental restrictions on certain types of expressive

conduct—most commonly, zoning ordinances that apply specifically to establishments offering adult entertainment—are subject to merely intermediate scrutiny even though they are content-based. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–51 (1986). But this lesser scrutiny applies only so long as the *purpose and effect* of the restrictions is to reduce the negative "secondary effects" of the expression—such as the increased crime that occurs in neighborhoods with a high concentration of adult theaters—rather than to suppress the expression itself. *Id.* at 49. As Justice Kennedy's controlling opinion in *City of Los Angeles v. Alameda Books, Incorporated*, 535 U.S. 425 (2002), makes clear, in defending a restriction as narrowly tailored to further an important or substantial governmental interest, the government may not rely on the proposition "that it will reduce secondary effects by reducing speech in the same proportion." *Id.* at 449. "It is no trick to reduce secondary effects by reducing speech or its audience; but [the government] may not attack secondary effects indirectly by attacking speech." *Id.* at 450; *see also Heller v. District of Columbia (Heller III)*, 801 F.3d 264, 280 (D.C. Cir. 2015); *Grace*, 187 F. Supp. 3d at 148.

But that is precisely what Maryland has done here. Its restrictive licensing policies do not regulate the *manner* of bearing arms or impose reasonable training and safety requirements. No, their purpose and effect is to *limit the number of arms borne in public*. As *Woollard* itself describes, to the extent "the good-and-substantial-reason requirement advances the objectives of protecting public safety and preventing crime" it is "because it reduces the number of handguns carried in public." 712 F.3d at 879. Limits like Defendants' "good and substantial reason" restriction thus "destroy[ ] the ordinarily situated citizen's right to bear arms not as a side effect of applying other, reasonable regulations . . . but by design." *Wrenn*, 864 F.3d at 666. That is "not a permissible strategy," *Grace*, 187 F. Supp. 3d at 148, under any level of heightened scrutiny.

2.      Even if the purpose and effect of suppressing public carriage of arms were not *intrinsically* unconstitutional, independently, that purpose and effect *become* unconstitutional if not sufficiently tailored to the government's asserted goals—in both of two ways. First, objectively, there must be "a close fit between ends and means," *McCullen v. Coakley*, 573 U.S. 464, 486 (2014); *accord Bruni v. City of Pittsburgh*, 824 F.3d 353, 365 (3d Cir. 2016). That is, the government "must prove that the law in dispute does not 'regulate [bearing arms] in such a manner that  substantial portion of the burden on [arms-bearing] does not serve to advance its goals]," *Billups v. City of Charleston* 961 F.3d 673, 688 n.9 (4th Cir. 2020) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). Second, subjectively, the State must actually have considered alternatives to the course it adopted. *McCullen*, 573 U.S. at 2539–40; *accord Bruni*, 824 F.3d at 367–68. "In other words, the government is obliged to demonstrate that it actually tried or considered less-[arms-bearing]-restrictive alternatives and that such alternatives were inadequate to serve the government's interest." *Billups*, 961 F.3d at 688.  Maryland's law is not sufficiently tailored in *either* sense.

The objective-fit requirement is not met here because of the utter lack of fit between Defendants' restrictions and their purported objective of public safety. After all, "the fact that a person can demonstrate a heightened need for self-defense says nothing about whether he or she is more or less likely to misuse a gun." *Grace*, 187 F. Supp. 3d at 149. "This limitation will neither make it less likely that those who meet the [good reason] requirement will accidentally shoot themselves or others, nor make it less likely that they will turn to a life of crime. Put simply, the solution is unrelated to the problem it intends to solve." *Drake v. Filko*, 724 F.3d 426, 454 (3d Cir. 2013) (Hardiman, J., dissenting).

Nor is that surprising, as Maryland failed to consider substantial alternatives, thereby violating the second requirement of narrow tailoring under *McCullen*. To "justify its choice to adopt the ['good and substantial reason' requirement]," Maryland "would have to show either that substantially less-restrictive alternatives were tried and failed, or that the alternatives were closely examined and ruled out for good reason." *See Bruni*, 824 F.3d at 370. But when Maryland first passed its ban on typical citizens carrying firearms in 1972, it stated only that "current law has not been effective in curbing the more frequent use of handguns in committing crime" and that "additional regulations on the wearing, carrying, and transporting of handguns are necessary to preserve the peace and tranquility of the State and to protect the rights and liberties of the public." *See* Md. Code Ann., Crim. Law § 4-202 (West). This was "simply to say that other approaches have not worked" and thus was "not enough" to overcome "the vital [Second] Amendment interests at stake." *See McCullen*, 573 U.S. at 496. Under the Second Amendment, Maryland unconstitutionally chose to "forego a range of alternatives—which would burden substantially less [arms-bearing] than a blanket prohibition on Plaintiffs' [public carriage of arms]—without a meaningful record demonstrating that those options would fail to alleviate the problems meant to be addressed." *See Bruni*, 824 F.3d at 371.

3.     Furthermore, even setting aside *all* of the foregoing legal barriers to the satisfaction of intermediate scrutiny, the heightened need requirement *still* flunks intermediate scrutiny, and *Woollard* was wrong to uphold it. To survive intermediate scrutiny, a restriction must be "substantially related to the achievement" of the government's objective. *United States v. Virginia*, 518 U.S. 515, 533 (1996). "The burden of justification is demanding and it rests entirely on the State." *Id.* As Judge Posner concluded after surveying "the empirical literature on the effects of allowing the carriage of guns in public," that data does not provide "more than merely a rational

basis for believing that [a ban on public carriage] is justified by an increase in public safety." *Moore*, 702 F.3d at 939, 942.

This is confirmed by experience. Forty-two States do not restrict the carrying of firearms to a privileged few. *See Guide to the Interstate Transportation of Firearms, Gun Laws*, NRA-ILA, https://bit.ly/3ak1G3n (last visited Dec. 21, 2020). Yet "many years of evidence across different states and time periods overwhelmingly rejects" the claim that "permit holders will use their guns to commit crimes instead of using their guns for self-defense." David B. Mustard, *Comment*, *in* Evaluating Gun Policy 325, 330 (Jens Ludwig & Philip J. Cook eds., 2003); *see also id.* at 330–31. Permit holders are among the most law-abiding persons in America, with crime rates a fraction of those of commissioned police officers and far lower still than those of the general population. *See* John R. Lott, Concealed Carry Permit Holders Across the United States: 2018 34 (Aug. 29, 2018) (unpublished manuscript), https://bit.ly/37DwJ8e. As social scientists who favor gun control have acknowledged, there would be "relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand," since "[t]he available data about permit holders . . . imply that they are at fairly low risk of misusing guns." Philip J. Cook et al., *Gun Control After Heller*, 56 UCLA L. Rev. 1041, 1082 (2009).

Further, even if laws that more freely grant permits have not been shown to decrease crime, there is no persuasive evidence for the proposition Defendants must substantiate—that they *increase* crime. That is confirmed by the determinations of both respected, public-interest research organizations that have comprehensively looked at the issue: the National Research Council and the Centers for Disease Control and Prevention. After exhaustively surveying every reputable study on the topic, the blue-ribbon NRC committee concluded that "with the current evidence it is

not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." National Research Council, *Firearms and Violence: A Critical Review* 150 (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005). And the CDC's task force on the topic, after completing a similar exhaustive review, likewise concluded that the existing evidence simply does not establish that a more permissive carry regime "increases rates of unintended and intended injury in interpersonal confrontations." Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 Am. J. Preventative Med. 40, 53–54 (2005).

*Woollard*'s cursory discussion of whether Maryland's "good and substantial reason" requirement actually advances its public-safety justification fell far short of the court's duty "to assure that, in formulating its judgments, [Maryland] has drawn reasonable inferences based on substantial evidence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994). The Fourth Circuit did little more than parrot Maryland's assertion that its restriction advances public safety by, for example, "[d]ecreasing the availability of handguns to criminals via theft," and "[c]urtailing the presence of handguns during routine police-citizen encounters." *Woollard*, 712 F.3d at 879–80. The Court did not analyze *any* empirical studies supporting these propositions, nor did it weigh (or even mention) the robust social-science evidence cited above that *fails* to find any causal link between public safety and restrictions on carrying firearms outside the home. *Woollard*'s facile scrutiny of the "good and substantial reason" requirement was "heightened" in name only.

In an attempt to shore up the empirical support for its requirement, Defendants cite a handful of studies that, they say, "present additional compelling support for the Fourth Circuit's holding that there exists a 'reasonable fit' between Maryland's 'good and substantial reason' requirement and the governmental objectives of protecting public safety and preventing crime." MTD Mem. at 5. None of the cited studies comes close to filling the void left by *Woollard*.

Defendants' primary piece of evidence is a reference, in a 2016 committee report by the Johns Hopkins Center for Gun Policy and Research, to a research project of a committee member, John J. Donohue. The research itself is not provided, either in full or by citation. Apparently, though, this research developed into what Defendants double-count as "[a]nother comprehensive study." This study, Defendants assert, "found that shall-issue laws increase violent crime and murder." MTD Mem. at 6 (citing John J. Donohue et al., *Right to Carry laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State Level Synthetic Controls Analysis*, https://bit.ly/3gQYVrj (Stan. L. & Econ. Olin Working Paper No. 508, 2017) ("Donohue 2017")).[3]

In fact, the study states that right-to-carry laws' "effects on property crime and murder" were "not statistically significant." Donohue 2017 at 3. As for the study's estimation that right-to-carry laws are "associated with" higher "aggregate violent crime," that conclusion is fatally undercut by numerous flaws in the study's design.

To start, measuring effects on "violent crime," as defined in Donohue 2017, obscures more than it reveals. That category is "largely composed of the most unreliably measured type of violent crime, aggravated assault." Gary Kleck, The Effect of Right-to-Carry Laws on Crime Rates: A Critique of the Donohue et al. (2018) Analysis 19 (Sept. 8, 2018) (unpublished manuscript), https://bit.ly/3mqMrYC. Such inherent unreliability in the data means that aggravated assault, and thus "violent crime," may not in fact have increased as Donohue 2017 suggests. On the other hand, if it *did* increase, that increase may be driven by aggravated assault alone. Indeed, because "violent crime" in Donohue 2017 is an opaque, "heterogeneous grab-bag of four radically different kinds

---

[3] This paper was eventually published as John Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Stud. 198 (2019). For present purposes, the published paper is identical to Donohue 2017.

of crime[—]murder, rape, aggravated assault, and robbery"—it is entirely consistent with Donohue 2017 that right-to-carry laws "*reduce* three of the four types of violent crime, but increase one numerous crime type, with a net overall crime-increasing effect on the [violent-crime rate] as a whole." *Id.* at 15. Finding an increase in "violent crime," then, is hardly informative.

Further, though, the method that Donohue 2017 uses to find a putative increase is not well deployed. The "synthetic control method" compares crime rates in States that allow law-abiding citizens to carry firearms, not with *real* States like Maryland that restrict public carry, but rather with *hypothetical* States that are constructed by combining bits and pieces of many different States. For instance, the authors analyze Texas by comparing its crime rates with "synthetic Texas," which is made up of 57.8% of California, 9.7% of Nebraska, and 32.6% of Wisconsin. *Id.* at 22. Similarly, "synthetic Pennsylvania" is constructed out of pieces of *eight different states*. *Id.* at 24. Because of the artificiality of such an analysis, even the authors are forced to admit that "there will undoubtedly be a deviation from the 'true' counterfactual and our estimated counterfactual." Donohue 2017. at 25–26. And such deviation is more likely still where, as here, "synthetic controls are poor" in that "they do not track pre-[right-to-carry] trends in [violent crime rates] very well at all, and thus are not likely to be able to effectively predict post-[right-to-carry] trends in the absence of [right-to-carry] laws. Kleck at 28. In short, Donohue 2017's method is faulty.

Yet, even taking the paper's model at face value, the results it produces fall short of redeeming Maryland's bold claims that its "good and substantial reason" restriction leads to an increase in public safety. In Donohue 2017, "out of 33 total [right-to-carry] states analyzed, 27 states either did not experience worse post-[right-to-carry] trends in [violent crime rates] compared to their synthetic controls (13 states)" or else experienced deviations "inconsistent with the interpretation that [these deviations] were due to implementation of [right-to-carry] laws." Kleck

29

at 33. And even the authors accept that the effect on murder rates of loosening restrictions on public carry was "in no case . . . statistically significant," which, they admit, "might seem to be at odds with our theoretical expectations, and in conflict with the estimated increases in overall violent crime." Donohue 2017 at 99. Vindication of an alleged need to restrict the exercise of Second Amendment rights, Donohue 2017 is not.

And the other papers cited by Defendants add little. One is an unpublished 2012 study that *explicitly affirms* the NRC's judgment that the evidence is not sufficient to show *any causal link* between laws limiting public carrying of firearms and crime rates; this paper cautions that while such laws *might* decrease crime rates, any such conclusion *cannot be determined* "with the level of certainty one strives for in academic work." Abhay Aneja et al., *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* 79–80 (Nat'l Bureau of Econ. Rsch., Working Paper No. 23510, 2012), https://bit.ly/2WfSZhY.

Another study concerns gun control measures *other* than restrictions on the right to carry— such as restrictions prohibiting "felons, persons who are subject to a restraining order for domestic violence, [or] individuals with serious mental illnesses" from possessing firearms—and thus does not even *purport* to address carrying outside the home. Daniel W. Webster & Garen J. Wintemute, *Effects of Policies Designed to Keep Firearms from High-Risk Individuals*, 36 Ann. Rev. Pub. Health 21, 22 (2015), https://bit.ly/2LvXYsQ. Defendants cite this study as concluding that "handgun permit and licensing laws are '[t]he type of firearm policy most consistently associated with curtailing the diversion of guns to criminals and for which some evidence indicates protective effects against gun violence.' " MTD Mem. at 6. But selective quotation here obscures the actual

30

referent of the quoted statement—a permit-to-*purchase* policy. Webster, *supra*, at 34. As that policy is not at issue in this case, the Webster study is simply irrelevant.[4]

That leaves Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 Am. J. Pub. Health 1923 (2017), https://bit.ly/3r1r57R, which at least concerns public carrying, but like the NRC and the Aneja study, this study explicitly cautions that it does *not* find *any causal link* between more permissive carry regimes and violent crime. *See id.* at 1928.[5]

Defendants' supposed empirical evidence thus proves nothing. And Defendants utterly fail to reckon with the comprehensive social science evidence indicating that more permissive concealed carry regimes either have *no effect* on violent crime or *actually reduce crime rates. See, e.g.*, Mark E. Hamill et al., *State Level Firearm Concealed-Carry Legislation & Rates of Homicide & Other Violent Crime*, J. Am. C. Surgeons (2019) (concluding that, from 1986 to 2015, "there was no significant association between shifts from restrictive to nonrestrictive carry legislation on violent crime and public health indicators"); *see also* Kleck at 13 ("just among studies published up through 2005, no less than 14 studies conclud[e] that RTC laws reduce crime, and 8 studies conclud[e] that the laws had no net effect").

The lack of evidence that these laws advance public safety should not be surprising,

---

[4] Another touted study, Cassandra Crifasi et al., *Association Between Firearm Laws and Homicide in Urban Counties*, 95 J. Urb. Health 773 (2018), also focuses on permit-to-purchase policies, and its research is limited to large, urban U.S. counties. *See id.* at 387. Moreover, even on its own terms, the study leaves open whether "specific elements of [right-to-carry] laws, or lack thereof, have differential impacts on firearm homicide." *Id.*

[5] Another over-hyped study, Mark Gius, *Using the Synthetic Control Method to Determine the Effects of Concealed Carry Laws on State-Level Murder Rates*, 57 Int'l Rev. L. & Econ. 1 (2019), is similarly self-limiting. *Id.* at 10 ("given the inconclusiveness of the [synthetic control method] results, no public policy proposals should be gleaned from this study").

because violent criminals will continue to carry guns in public regardless. As the Supreme Court recently held in the context of abortion restrictions, "[d]etermined wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced to [change their conduct] by a new overlay of regulations." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2313–14 (2016). This is not a novel proposition. In a passage Thomas Jefferson copied into his personal quotation book, influential Italian criminologist and penal reformer Cesare Beccaria reasoned that laws forbidding the

> wear[ing of] arms . . . disarm[ ] those only who are not disposed to commit the crime which the laws mean to prevent. Can it be supposed, that those who have the courage to violate the most sacred laws of humanity, and the most important of the code, will respect the less considerable and arbitrary injunctions, the violation of which is so easy, and of so little comparative importance? . . . [Such a law] certainly makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder.

*See* Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms,"* 49 Law & Contemp. Probs. 151, 154 (1986).

Instead of criminals, it is primarily the *law-abiding* who are affected by Defendants' restrictions. And that effect has very real public-safety *costs*—costs that Maryland entirely ignores. Although the number of defensive gun-uses is difficult to measure, the leading study on the issue "indicate[s] that each year in the U.S. there are about 2.2 to 2.5 million [defensive uses of guns] of all types by civilians against humans." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Crim'gy 150, 164 (1995). "At least 19 other surveys have resulted in [similar] estimated numbers of defensive gun uses." National Research Council, *supra*, at 103. Many of these defensive gun-uses involve carrying firearms in public. The National Self-Defense Survey indicates that "anywhere from 670,000 to 1,570,000 [defensive gun-uses] a year occur in connection with gun carrying in a public place."

Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. Rsch. in Crime & Delinquency 193, 195 (1998).

In fact, the FBI has found that permit holders have even stopped mass shootings, on eight separate occasions in over relatively short time span. FBI, *Active Shooter Incidents in the United States in 2016 and 2017* 8 (Apr. 2018), https://www.fbi.gov/file-repository/active-shooter-incidents-us-2016-2017.pdf/view. Out of the fifty incidents that the FBI studied, "[a]rmed and unarmed citizens engaged the shooter in 10 incidents. They safely and successfully ended the shootings in eight of those incidents. Their selfless actions likely saved many lives." *Id.* Any realistic appraisal of existing social-scientific data thus leads inexorably to the conclusion that the "good and substantial reason" requirement cannot be shown to benefit public safety—but it may well harm it.

## CONCLUSION

For the foregoing reasons, Plaintiffs have a fundamental right to bear loaded, operable handguns outside the home, and *Woollard* should be overruled by a court competent to do so.

Dated: December 21, 2020                Respectfully submitted,


                                        s/ Nicole J. Moss
                                        Nicole J. Moss, Bar No. 20222
                                           *Attorney of Record*
                                        David H. Thompson*
                                        Peter A. Patterson*
                                        John D. Ohlendorf*
                                        COOPER & KIRK, PLLC
                                        1523 New Hampshire Avenue, N.W.
                                        Washington, D.C. 20036
                                        (202) 220-9600
                                        (202) 220-9601 (fax)
                                        nmoss@cooperkirk.com


                                         *Appearing *pro hac vice*

                                        *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will cause a copy of the document to be served electronically on all parties or their counsel.


Dated:  December 21, 2020                              s/ Nicole J. Moss
                                                                      Nicole J. Moss

                                                                      *Attorney for Plaintiffs*